## STANDARD OIL CO. OF NEW JERSEY v. UNITED STATES et al.

District Court, S. D. Alabama.    July 7, 1928.

**1. Collision ⟂15—As regards liability for collision, port regulation requiring chief wharfinger to appoint person to shift, moor, or unmoor vessels, made employment of pilot compulsory (Code Ala. 1923, § 2487).**

As regards liability for collision, port regulation requiring chief wharfinger to appoint person to shift, moor, or unmoor vessels, *held* to have made employment of a pilot for such purpose compulsory, particularly in view of Code Ala. 1923, § 2487, providing a fine for violation of any of the rules and regulations governing the port.

**2. Collision ⟂115—Negligence of pilot taken under compulsion is no defense to ship causing collision.**

Even though pilot to move ship was taken on under compulsion, pursuant to port regulations, it is no defense to ship that injury occurring in collision was caused by negligence of pilot.

**3. Collision ⟂115—United States is liable for damage caused by negligence of pilot on shipping board vessel through collision, though compelled to take such pilot (Admiralty Act [46 USCA §§ 741-752]).**

Where libelant for an injury caused by collision with shipping board vessel elected to proceed in rem under Suits in Admiralty Act (46 USCA §§ 741–752), the United States will be *held* liable for negligence of pilot causing the damage, though ship was compelled to take pilot, only effect of act being to forbid seizure of vessel and substitute the United States, just as if vessel had in fact been seized and claimed by the United States and released on bond.

**4. Collision ⟂73—Vessel colliding with moored ship while shifting berth had burden of acquitting herself of negligence.**

Vessel, colliding with moored ship while shifting berth, had burden of showing why she collided, and to acquit herself of negligence.

**5. Collision ⟂71(2)—Negligence of pilot on ship shifting berth held cause of collision with moored ship.**

Negligence of pilot of ship while shifting berth *held* to have caused collision with ship

moored to pier, together with failure of moving ship to run out sufficient anchor chain.

**6. Collision ⬡⟿115—Dock owner held not negligent in collision between moored ship and vessel shifting berth.**

Owner of dock at which ship was moored *held* not guilty of any negligence in collision between such ship and another vessel shifting her berth by reason of manner in which ship was moored.

**7. Collision ⬡⟿115—State dock commission held not liable for negligence of pilot in its employ, whose negligence caused collision.**

State dock commission *held* not liable for negligence of pilot on vessel shifting berth merely by reason of fact that pilot was in pay of commission at time of such collision.

In Admiralty. Libel by the Standard Oil Company of New Jersey against the United States, as owner of the steamer Casey, and others. Decree in accordance with opinion.

Pillans, Cowley & Gresham, of Mobile, Ala., for libelant.

Alex C. Birch, U. S. Atty., and J. E. Meredith, Asst. U. S. Atty., both of Mobile, Ala., for the United States.

Stevens, McCorvey, McLeod, Goode & Turner, of Mobile, Ala., Thomas C. McClellan, of Birmingham, Ala., and S. Palmer Gaillard, Jr., of Mobile, Ala., for the State Docks Commission and Dorgan.

ERVIN, District Judge. This was a libel filed by the Standard Oil Company against the United States as owner of the steamer Casey, a Shipping Board Emergency Fleet Corporation vessel, and against the tugs, Buzzard and Nimrod, and against the Mobile Towing & Wrecking Company, as owner of said tugs, and against the Todd Shipbuilding & Dry Dock Company. The libel was filed under the Suits in Admiralty Act (46 USCA §§ 741–752; Comp. St. §§ 1251¼–1251¼k), as in rem, for an injury to the steamer Bostwick, caused by a collision with the steamer Casey.

The United States, upon the filing of the libel, cited in, under the fifty-sixth admiralty rule, the state docks commission and T. E. Dorgan, the deputy harbor master, who was in charge of the Casey at the time of the collision. It was charged that an application was made by the Casey to the docks commission for leave to shift her berth to the docks of the Todd company, and that a pilot be furnished to conduct the Casey to said dock; leave was granted, and Dorgan, who was a deputy harbor master, was furnished as the pilot to take charge of the shifting; that a fee was paid the docks commission for the

services rendered by Dorgan, who was paid a salary by the commission for his services. It was further charged that Dorgan was negligent in conducting the manœuvre, and that the injury to the Bostwick was caused by this negligence of said Dorgan, and it is prayed that, if the United States was held liable, both Dorgan and the commission should be required to repay such damages as the United States should be required to pay. It is further charged that the employment of the deputy harbor master to act as pilot was compulsory upon the Casey when she desired to shift her berth in the port. The docks commission and Dorgan pleaded to the jurisdiction and upon exception these pleas were held bad. Standard Oil Co. v. U. S. (D. C.) 25 F.(2d) 480.

The first question is whether or not, under the rules and regulations of the port of Mobile and the law, the employment of a pilot by the Casey was compulsory. Prior to the act of the Legislature (Acts 1923, p. 330) creating the Alabama state docks commission, there was functioning in Mobile a commission entitled the state harbor commission, who had charge of the port of Mobile, the channel lines, the anchorage grounds, and the movement of vessels therein. This commission had a regulation covering the shifting of ships from one berth to another which read as follows:

"No one shall superintend the shifting, mooring, or unmooring of vessels, or assist any one to shift, moor, or unmoor vessels in the harbor of Mobile unless authorized by the state harbor commission."

Complaint was made of this regulation being unjust in that it prevented a master shifting his own vessels without having a deputy on board, so the regulation was amended so as to read as follows:

"That the chief wharfinger be permitted to use his discretion in appointing any one to shift, moor, or unmoor vessels in the harbor of Mobile under the authority of the state harbor commission."

The evidence shows that the Alabama state docks commission continued to act under this regulation, and that the proceedings in the instant case were had under it. [1] Section 2487 of the Code of Alabama provides that any person who should violate any of the rules and regulations governing the port of Mobile may be fined not exceeding $50. It will be noted that the regulation as amended permitted the chief wharfinger to appoint any one to shift, moor, or unmoor vessels, but certainly nobody had the author-

ity to do this unless appointed for that purpose by the chief wharfinger. Further, the master or mate of the vessel would have no authority to shift the vessel, unless so appointed by the chief wharfinger. This practice had been in force in Mobile for a number of years, and the question arises whether or not it made the employment of a pilot compulsory. In my opinion, under the authorities, it did.

Many of the lower courts have held, both before and since the decision in The China, that, unless a penalty was imposed for the failure to employ a pilot, such employment was not compulsory. In my opinion, those courts who have so held since the decision of The China, 74 U. S. (7 Wall.) 53, 19 L. Ed. 67, have overlooked that case, for I cannot conceive of any of the lower courts so holding in the face of the ruling in that case. An examination of the case will show that, after discussing a number of questions, when it comes to this question, the court says:

"All port regulations are compulsory. The provisions of the statute of New York are a part of the series within that category."

If it had not been for the dissenting opinion, we might be left somewhat in doubt as to the meaning of these words in the decision of the court, but in the dissenting opinion by Justice Clifford, concurred in by Justice Field, we find the following on page 70:

"All of these cases decide that the state statutes requiring the master to take a licensed pilot and making provision for the payment of pilot fees, do not amount to a compulsion to take a pilot, and I am satisfied they are correct, and that such a statute cannot be set up as exempting a ship from responsibility while navigated by a licensed pilot.

"Believing those decisions to be correct, I cannot consent to pronounce them incorrect, especially as no such conclusion is necessary to the right disposition of the present case. * * * Dissenting as I do from the rule laid down in the English courts, I concur with the majority of the court in overruling those decisions as applied to our jurisprudence, but I cannot concur in overruling the American decisions which assert the opposite doctrine, because I believe they are correct."

It is, therefore, manifest that the court understood the decision in the case overruled the lower American courts, who had held that the state statutes and port regulations requiring the taking of a pilot did not amount to compulsion. Otherwise, there would never have been any dissent, because this is the only question on which these two Justices dissent.

Necessarily, therefore, the statement in the majority opinion, "All port regulations are compulsory," was advisedly made, and was intended to overrule the lower courts who had held to the contrary. Therefore it seems to me that all subsequent rulings by the lower courts in line with the previous ones are directly in the teeth of the holding in The China. I do not find anywhere that that case has ever been reversed, modified, or limited, though often cited. Hence, in my opinion, it is as much the law to-day as it was the day it was written, and is also binding on all the lower courts.

[2] The China, supra, also held that in admiralty it was no defense to a vessel that a tort committed by her was due to the negligence of a pilot whom she was compelled to take on board. The instant suit being in admiralty, following the decision in The China, I hold that, even though the pilot was taken under compulsion, it is no defense to the Casey that the injury was caused by the negligence of the pilot.

The case of Homer Ramsdell Transportation Co. v. La Compagnie Generale Transatlantique, 182 U. S. 406, 21 S. Ct. 831, 45 L. Ed. 1155, is urged upon me as holding that the pilot, being taken under compulsion, was not the agent of the Casey. The record shows that the Ramsdell Case was an action at law, and the court was laying down the rule followed in law as contradistinguished to that followed in admiralty. In fact, upon page 413 of the opinion (21 S. Ct. 831), the court expressly recognizes the difference between the maritime rule laid down in The China and the common-law rule. The difference between the rule followed in the admiralty and the one followed in common law is also laid down in Workman v. New York, 179 U. S. 556, 21 S. Ct. 212, 45 L. Ed. 314.

It is further urged in defense by the United States that, the libel being filed against it under the Suits in Admiralty Act and the Casey not being seized, the libel is to be treated as one in personam and not in rem; hence Dorgan, the pilot, taken under compulsion, was not to be considered a servant of the United States. The Hathor (D. C.) 167 F. 194; The Oceanica (C. C. A.) 170 F. 893; Homer Ramsdell Trans. Co. v. La Comp. Gen. Trans., 182 U. S. 406, 21 S. Ct. 831, 45 L. Ed. 1155.

[3] The libelant elects to proceed in this case as in rem. Hence it seems to me the only effect of the act is to forbid the seizure of the vessel, and to substitute the United

States in place of the vessel, leaving all the proceedings just as if the vessel had, in fact, been seized and claimed by the United States and released on bond. The act expressly recognizes the right to proceed either in rem or in personam, but in neither case is seizure of the vessel to be made.

If the libel is in rem, the fact that the Casey was compelled to take a pilot makes no difference, and the United States will be liable, if the pilot so taken negligently causes the damage. The China, supra. What difference could it make to the injured vessel whether the pilot whose negligence caused the injury was a regular employee of the damaging vessel, or one it was required to take? It would be the same vessel to collide, and the damage will be the same. Libelant had nothing to do with the employment or direction of the negligent pilot, and so was in no wise responsible for him.

As to the facts, the Casey was being shifted in the Mobile river to a slip of the Todd Shipbuilding Company on the west side of the river. The Bostwick was at the time made fast on the south side of such slip, but projecting some 130 feet from the wharf into the river. The Casey was in tow of two tugs, the Buzzard and the Nimrod, one on each side, and was in charge of T. E. Dorgan, a deputy harbor master, who was employed by the state docks commission, and was paid by them a regular salary. Dorgan was designated for service on the Casey by the chief harbor master, who is the same as the chief wharfinger. The Casey paid a fee of $10 for such shift. The fee of the state docks commission was paid on the filing of the application for the shifting of the Casey from her berth to the slip of the Todd Company.

The point of contact with the Bostwick by the Casey was 25 feet inside and west of the east line of the wharf to which the Bostwick was made fast, and the Casey was coming down the river, or in a southerly direction. When the Casey started, the tide was slack, or just beginning to ebb. The Casey was somewhat down by the head and was being towed stern first. The pier head on the north side of the slip was somewhat shorter or to the west of the one on the south side of the slip, and it was intended to dock the Casey in the slip alongside of such northern side.

The master of the Casey, during the movement, was alongside the pilot, Dorgan, and, as the Casey neared the slip, the pilot ordered the tug Nimrod, on her port side, to let go at 12:25 p. m. The master, about that time, asked the pilot if he needed the anchors, and the pilot replied in the negative. Orders were given to have the anchors ready, and at 12:28 the pilot ordered the port anchor let go, then both anchors were let go, but only eight fathoms were let out, and the headway of the Casey was slowed down, but not stopped, and at 12:31 the stern of the Casey collided with the Bostwick, causing the damage complained of.

It seems by this time the tide had begun to ebb, a fact the pilot had apparently overlooked. The pilot testified he had the Nimrod let go to get her out of danger of pierhead, and intended to use the Buzzard to swing the stern into the slip, but he did not let out any line to the wharf to aid this movement.

[4] There was no high wind, and what there was was favorable to him, being from the south. It was incumbent upon the Casey to show why she collided and to acquit herself of negligence. The Ceylon Maru (D. C.) 266 F. 400. It is manifest that several things could have been done which would have prevented the collision. Had the pilot ordered the Nimrod to back up before she let go, it would have swung the Casey's stern to the westward, as well as helped to slow her down; or had he ordered the line from the Nimrod to the Casey paid out, instead of cast off, the Nimrod, though entirely out of danger, could have hauled back on this line, and so both helped to turn the Casey and also to slow her down. Had he steered close enough to the wharf to pass a line out, that line could also have aided him in the same manner. Had he let go the anchors when the captain suggested it, that would have stopped the Casey, provided enough chain had been let go, or, had he observed the change in the tide, that would also have made a difference in his timing. Had the Casey let out more chain, instead of only eight fathoms, that would also no doubt have stopped the Casey in time.

[5] I find that the negligence of the pilot, T. E. Dorgan, caused the collision, and I further find that the failure of the Casey to let out more chain contributed. "Most collisions are inevitable at the moment they occur, but the primary rule is that precautions must be seasonable. * * * Inability to prevent a collision usually exists at the time it occurs, but it is generally an easy matter to trace the cause of the disaster to some negligent or unskillful act, or to some antecedent omission of duty on the part of one or the other or both of the colliding ves-

sels." The Merrimac, 14 Wall. 203, 20 L. Ed. 873. I do not find any negligence on the part of the tugs, Buzzard or Nimrod.

[6] It is claimed that the Bostwick was moored in a dangerous manner with her stern projecting some 130 feet out in the river. Conceding that her position was improper, I cannot find that fact contributed in any way to the collision. She was on the south side of the slip, and took up no more of it' than her width. The Casey was coming from the north, and was going in alongside of her to tie up on the north side of the slip, and the blow was struck 25 feet inside and to the westward of the east side of the slip. Had the Bostwick been moored alongside of the wharf, as she was, but not projecting one foot in the river to the east, she would still have been struck, so I cannot see how the fact that she projected into the river affects the question. I therefore find that the Todd Shipbuilding & Dry Docks Company were not guilty of any contributing negligence.

The question as to the liability of the state docks commission depends upon the facts and the meaning of the regulation in force providing for the shifting of the vessels in the harbor. Bearing in mind that the original regulation heretofore quoted was changed for the purpose of permitting the authorization of the master of the vessel to shift the anchorage, let us examine the regulation as amended. It provides "that the chief wharfinger be permitted to use his discretion in appointing any one to shift, moor, or unmoor vessels in the harbor of Mobile under the authority of the state harbor commission."

In the first place, it will be noted that whereas, under the original regulation, permission had to be obtained from the state harbor commission, under the amended one, this permission is obtained from the chief wharfinger, who was an employee of this commission. In the second place, the discretion is given to the chief wharfinger to appoint any one to do the shifting. Of course, he would be expected to see that the appointee was qualified as a pilot to supervise the shifting.

While the purpose of the change in the wording of the regulation was to enable the chief wharfinger to appoint the master of the vessel desiring to shift to superintend the shifting, the actual change goes much farther, and authorizes him to appoint any one the chief wharfinger thought qualified, whether such person was the master of' the vessel seeking to shift, the master of some tugboat, the master of some other ship, or a regularly licensed pilot of the port. In other words, he is to designate the pilot, but is not limited to, or required to designate, an employee of the docks commission or one of the deputy wharfingers.

Now, suppose the chief wharfinger should appoint the master of the vessel seeking to shift, or the master of some tugboat, or of some other ship, no one of these people being in the employ of the state docks commission, yet undoubtedly the $10 fee for the shifting would have to be paid before the consent of the chief wharfinger was given. Nor would it be contended that such designee of the chief wharfinger would receive the $10 fee, or any part thereof. This shows conclusively to my mind that the $10 fee is paid, not for the superintending by the pilot of the shift, but for the permission to make the shift.

Now, suppose either one of the men just mentioned who were not in the employ of the state docks commission were guilty of negligence while superintending, as a pilot, the shifting. Could it be contended that the docks commission would be liable? If not, then liability would depend upon the fact that the pilot designated by the chief wharfinger was an employee of the docks commission. Suppose the designee was an employee of the docks commission, but not one of the deputy wharfingers. In this way he would be drawing pay maybe for an entirely different kind of service.

[7] Would the docks commission then be liable merely because its employee so designated had been negligent? These regulations were adopted and enforced to enable the harbor commission to police and control the harbor, and prevent congestion. They were found and followed by the docks commission on its creation, and I feel that it would be carrying the doctrine of respondeat superior too far if I held the state docks commission liable under the facts in this case.

There is no pretense in this case that there was any negligence on the part of the docks commission, and, in fact, the evidence shows that Dorgan, while, in my opinion, negligent in the instant case, was ordinarily a careful, prudent, and competent pilot. Under the facts in this case, I do not feel that the mere fact that Dorgan was in the pay of the docks commission is sufficient to charge such commission with liability for his negligence.

A decree will be entered in accordance with this opinion.