## McWILLIAMS DREDGING CO. v. UNITED STATES.
### No. 1206.  In Admiralty.

United States District Court,
E. D. Louisiana, New Orleans Division.
June 18, 1952.

---

Brunswick G. Deutsch, of Deutsch, Kerrigan & Stiles, New Orleans, La., for libelant.

John McKay, U. S. Atty., New Orleans, La., Lansing L. Mitchell, Asst. U. S. Atty., Joseph V. Ferguson, Dist. Counsel, Maritime Administration, New Orleans, La., for respondent.

THOMAS, District Judge.

This cause involves a collision, and is a libel brought on the principles of an in rem proceeding under the provisions of the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq. The libelant seeks to recover for damage done to the discharge pipe line of one of its dredges, and for work stoppage occasioned thereby, when the line was struck by a tanker which, though under Norwegian registry, was owned by the United States.

The cause was argued on respondent's motion to dismiss for lack of jurisdiction; on libelant's motion to strike respondent's supplemental and amended answer; on libelant's exceptions to certain requests for admissions; and on the question of liability *vel non*. It was then taken under submission on testimony heard in court, and on depositions, exhibits, and briefs.

The circumstances surrounding the collision were as follows:

On May 30, 1946, the tank ship "Kirkenes" departed from Port Arthur, Texas, about 9:15 a. m. (C. S. T.) en route to sea. She was manned by a Norwegian crew and master, but was being conned by Don Allien, a branch pilot for the Sabine District. Such pilots are compulsory between Port Arthur and the sea buoy.

In going from Port Arthur to the sea buoy, it is necessary that vessels move through Sabine Pass. On the west bank

of Sabine Pass, near channel Station 130, is the United States Quarantine Station. On May 30, and for several days prior thereto, the dredge "G. A. McWilliams" was working in the vicinity of the Quarantine Station. The channel at this point was 500 feet wide, and adjoining the eastern boundary of the channel proper was an anchorage basin of equal depth with the channel. The "G. A. McWilliams", on the morning of May 30, lay with her bow downstream, and her port side along the center line of the channel, about 250 feet from the west bank. Her discharge pipe line led directly astern for a distance of approximately 100 feet, and then, turning to the east at a right angle, extended 2300 feet in a straight line across the channel and the anchorage basin, and into the spoil disposal area on the eastern edge of the anchorage basin.

The pipe line thus formed an "L", the first length of which was 100 feet long, leading up-stream directly astern of the dredge; the second length of which led off at a 90° angle to the right and extended eastward for a distance of 2,300 feet. This second length was of dual character. The westernmost 550 feet floated on pontoons which were not anchored, and it could thus be opened to permit passage of ships; the easternmost 1,750 feet rested on pontoons which were anchored, and it was thus immovable.

For convenience the entire length of pipe line will herein be designated into three segments, Segment No. 1 being the 100-foot length leading astern of the dredge; Segment No. 2 being the 550-foot flexible section; and Segment No. 3 being the 1,750-foot stationary section.

Segment No. 1 and Segment No. 2 were connected by a flexible elbow joint at a 90° angle to the right. This elbow joint was securely anchored and thus immovable. Segment No. 2 consisted of three separate lengths of pipe, the first being 250 feet long, the second 250 feet long, and the third, fifty feet long. All three of these sections were connected by ball joints at a 180° angle. Segment No. 2 and Segment No. 3 were connected by a ball joint at a 180° angle. The easternmost end of the pipe

line at low tide rested on the ground A wooden walkway, fitted with a hand rail, extended along the top of the line for its entire length.

At the location of this pipe line, the anchorage basin had a width of 800 feet, adjacent to the eastern boundary line of the 500-foot channel. The dredge was working under contract with the War Department of the United States, cleaning out and deepening the channel and the anchorage basin. The anchorage basin extended up-stream some 4,000 feet north of the pipe line, and the basin had a constant width of 1,300 feet (including the 500-foot width of the channel) for a distance of approximately one-half mile north of the pipe line.

On May 1 and 24, 1946, the United States Engineer Office had issued navigation notices to the effect that the "G. A. McWilliams" was working in the Port Arthur Canal and Sabine Pass Channel, and would continue to do so throughout the month of May. The notice given on May 24 read as follows:

"During the progess of the work in its present location in Sabine Pass Channel (near the U. S. Quarantine Station) the plant's discharge pipeline will extend to the east bank across the channel. The discharge line will be opened upon proper signal to allow for the passage of all vessels. Small craft which can safely pass on the west side of the dredge are expected to do so. The usual signal for passing should be given in sufficient time to enable the dredge operator to give the proper reply and to open the discharge line without delay.

"Vessel operators are directed to exercise the proper precaution in approaching the plant and pass in accordance with applicable regulations."

Pilot Don Allien, during the progress of this dredging work, had taken a number of vessels in and out of Port Arthur; and on seven previous occasions it had been necessary that the pipe line be opened for the passage of vessels he was piloting.

At 10:44 a. m. (C.S.T.), on May 30, the "Kirkenes" struck the pipe line at the point

where the ball joint connected the two above-described 250-foot sections of Segment No. 2, causing the whole segment to become disconnected from both Segment No. 1 and Segment No. 3. The disconnected Segment No. 2 was then carried downstream about 1,000 feet.

There was a great deal of testimony introduced from members of the crew of the "G. A. McWilliams", all generally giving the same version as to how the accident occurred. The only testimony on the merits offered by the Government was that of Pilot Don Allien.

War Department regulations applicable to craft engaged in dredging operations in Sabine-Neches waterway, as well as Pilot Rules for Inland Waters, in effect on May 30, 1946, provided, among other things, as follows:

"When the pipe line from a dredge crosses the channel in such a way that an approaching vessel, owing to excessive draft or for other reasons, cannot pass around the pipe line or dredge, a signal shall be given from the vessel by sounding 4 blasts of the whistle, which shall be answered by a like signal from the dredge. The pipe line shall then be opened for the passage of the vessel as soon as practicable; when the line is open ready for passage, the dredge shall so indicate by sounding the usual passing signal, and the approaching vessel shall promptly pass the dredge."

The testimony offered by the libelant was to the effect that three danger signals were sounded by the dredge, the first at 10:35 a. m., the second at 10:37 (or 10:38), and the third at 10:42 a. m. The collision occurred at 10:44.

Only two members of the crew of the "G. A. McWilliams" testified that they heard any signal ever given by the "Kirkenes". Deck Captain John W. Eagleson testified that at 10:41 the "Kirkenes" gave two blasts (which was the signal for passing to the port side of the dredge). John Acy, Civil Engineer on the dredge, testified he heard two blasts from the "Kirkenes" about a minute before he blew the third danger signal from the dredge. None of the other members of the crew of the

"G. A. McWilliams" heard any signal given by the "Kirkenes" prior to the collision; nor was any signal heard by Mr. Macon C. Ellis, who was aboard the "G. A. McWilliams", but was an employee of the United States Engineer Office.

As to signals, Pilot Don Allien, on cross-examination, testified in substance as follows: He was familiar with "Pilot Rules for Western Waters", and knew that Rule 8–A provided that when a vessel was approaching the pipe line of a dredge crossing a channel, the vessel was to give a four blast signal to be answered by a like signal from the dredge; that the pipe line was to be opened; and the dredge was then to give the first passing signal. He further testified:

"Q. Now, in this instance, you gave the first passing signal, did you not? A. I did.

"Q. Can you tell us why you did that, apparently contrary to the pilot rule? A. I did it to try to rush them up and get that pipe line up. I couldn't stop, and I wanted the pipe line moved."

Pilot Allien further testified that the "Kirkenes" was some three miles away to the north when he first saw the pipe line. There was other testimony by him as to reduction of speed to "dead slow" in approaching the pipe line, but his testimony was not borne out by either deck or engine room logs of his vessel. The tanker, according to the engine room log, was put on "slow ahead" two minutes before the collision. According to all of the testimony, the ship's engines were not reversed until after the collision. She did not stop until she was something in excess of a thousand feet south of where she struck the pipe line.

Deck Captain Eagleson, whose testimony was amply corroborated by other witnesses, testified that when he first saw the "Kirkenes" approaching, she was approximately 7,000 feet north of the pipe line; that he instantly gave orders for the pipe line to be opened, and the carrying out of these orders was at once commenced. Immediately after giving this order, Captain Eagleson blew the first danger signal at 10:35 a. m.

All of the testimony which had to do with the effort to open the pipe line to permit the passage of the on-coming "Kirkenes", was to the effect that one of the wedges in the ball joint (connecting Segments No. 2 and No. 3) which they were attempting to open, became fouled, and this accounted for the fact that the pipe line was not opened prior to its being struck by the "Kirkenes". This particular ball joint was the one always opened to permit passage of vessels; and in the normal course of operations this released end of Segment No. 2 would be swung down stream, and the vessel would then pass. The free end of Segment No. 2 would then be shoved back up stream into place, and the ball joint would again be connected. In this procedure, the pivot point was the flexible elbow joint connecting Segments No. 1 and No. 2.

Seconds before the impact, when it became apparent that the pipe line could not be opened, and that the "Kirkenes" would strike it, the men engaged in attempting to disconnect the ball joint jumped from the pipe line to the tug, which had been standing by to push the line down stream, and immediately thereafter, the pipe line was struck by the "Kirkenes." She carried the whole of Segment No. 2 downstream with her bow, and when she stopped, the tugs attending the dredge removed it. The "Kirkenes" then proceeded seaward.

### Discussion.

The allegations of Article II of the libel are as follows:

"Respondent, the United States of America (War Shipping Administration), has consented, by statute, to be sued herein. At all times hereinafter mentioned, the T/S "Kirkenes" was, and still is, owned by the United States of America (War Shipping Administration) and was, and still is, employed as a merchant vessel for the carriage of liquid cargos."

The respondent's answer, filed April 16, 1947, states, among other things, the following:

"The allegations of Article II of the libel are admitted."

The allegations of Article IX of the libel are as follows:

"All and singular the premises are true and within the admiralty and maritime jurisdiction of the United States and of this Honorable Court."

The respondent's answer to this allegation was as follows:

"Respondent admits the admiralty jurisdiction of this Honorable Court, but denies the allegations of the libel are true and correct, and avers that the full truth will only be found herein."

By motion filed on August 17, 1951, more than four years after the filing of its answer, respondent raised the proposition that inasmuch as libelant had elected to proceed on the principles of a libel in rem, the fact that the ship was outside the jurisdiction of the Eastern District of Louisiana at the time the libel was filed was a fatal defect. (The libelant's certified exhibits definitely establish the fact that on the date the libel was filed, the "Kirkenes" was in the port of New York.)

In this contention, I am of the opinion that respondent must fail. Since the "Kirkenes" was owned by the United States (War Shipping Administration), and was, at the time of the filing of the libel, within the territorial jurisdiction of the United States; and since libelant's principal place of business is in New Orleans, which is within the jurisdiction of this court, I believe that the jurisdictional and venue requirements have been fulfilled for proceeding under the provisions of the Suits in Admiralty Act in accordance with the principles of a libel in rem. Nahmeh v. U. S., 1925, 267 U.S. 122, 45 S.Ct. 277, 69 L.Ed. 536. See also "The Anna E. Morse," Thomson v. U. S., D.C., 287 F. 364; Markle v. U. S., 8 F.2d 87; Eastern Transp. Co. v. U. S., 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472.

Again seeking to attack the jurisdiction of the court, on September 7, 1951, eleven days before the trial date and almost four and a half years after it had filed its original answer, the respondent, in an ex parte proceeding, filed an amended answer, which among other things states:

"Respondent urges that portion of Article II[1] of the libel alleging that the United States has consented by statute to be sued herein is a conclusion of law and need not be admitted or denied. The remaining allegations of Article II of the libel are denied except as hereinafter specifically admitted."

And as to Article IX[2] of the libel, the amended answer, in part, is as follows:

"Respondent admits that this Honorable Court has jurisdiction of Admiralty and Maritime matters and urges that it is incumbent upon libelant to show that the court has jurisdiction of respondent in this matter and that the basis for the action against respondent is within the Admiralty and Maritime jurisdiction of the Court."

The amended pleading then seeks to set up the following additional defenses:

(1) The "Kirkenes" was not under the custody and control of the respondent because at the time of the accident she had been chartered to the Norwegian government and was under Norwegian registry; and at the time of the filing of the libel, while still under Norwegian registry and command, the vessel was subject to the provisions of an authorized purchase application.

(2) The "Kirkenes" was not a merchant vessel at the time of the filing of the libel, but was in idle status, having been allocated for sale.

(3) The "Kirkenes" was in charge of a compulsory pilot at the time of the accident.

On the day preceding the trial, the libelant filed its exception to the order granting respondent leave to amend its original answer, and moved the court to strike the amended answer.

■ It is my opinion that the respondent was dilatory in filing its amended answer, which is inconsistent with its original answer. Yet, since the amended answer seeks to raise jurisdictional questions, one of which has been settled in the ruling on the motion to dismiss; since most of its new allegations of fact are implicit even in the evidence offered by libelant; and since all of the questions of law and fact which it seeks to raise might well be introduced on a trial de novo in the court of appeals, respondent's amended answer will be admitted here, and libelant's motion denied. This action, however, does not relieve respondent of the probative effect of the admissions of its first answer. Kenah v. The John Markee, Jr., D.C.Pa.1880, 3 F. 45.

In support of its new allegations as to the ownership status, custody, and control of the vessel, and its idle status on the date libel was filed, the respondent submitted copies of official correspondence and records. There is nothing in these copies of official files or in the amended answer itself which controverts respondent's original admission of ownership.

■ And as to the new defenses (1) charter to the Norwegian government and (3) compulsory pilotage, I am of the opinion these defenses are not available in a suit proceeding on the principles of a libel in rem. The China, 1868, 7 Wall. 53, 74 U.S. 53, 70, 19 L.Ed. 67.

See also The John G. Stevens, 170 U.S. 113, 18 S.Ct. 544, 547, 42 L.Ed. 969:

"The foundation of the rule that collision gives to the party injured a *jus in re* in the offending ship is the principle of the maritime law that the ship, by whomsoever owned or navigated, is considered as herself the wrongdoer, liable for the tort * * *."

And see Standard Oil Co. of New Jersey v. United States, D.C.S.D.Ala., 27 F.2d 370, 372:

"* * * it seems to me the only effect of the act is to forbid the seizure of the vessel, and to substitute the United States in place of the vessel, leaving all the proceedings just as if the vessel had, in fact, been seized and claimed by the United States and released on bond. The act expressly recognizes the right to proceed either in rem or in personam, but in neither case is seizure of the vessel to be made."

1. Quoted above.

2. Quoted above.

588

■ As to the implied defense that the "Kirkenes" was in idle status and hence presumably not "employed as a merchant vessel" at the time the libel was filed, it was held in James Shewen & Sons, Inc. v. U. S., 1924, 266 U.S. 108, 45 S.Ct. 45, 69 L.Ed. 192, that the provision of the Act, 46 U.S.C. A. § 742, "employed as a merchant vessel" does not mean that the vessel, being a merchant vessel, must be actively employed as such when the action is commenced. See also Olavarria & Co. v. U. S., D.C.Ala. 1944, 56 F.Supp. 758.

Making a third attack on the jurisdiction of the court, respondent argues that damage to the discharge pipe line of a dredge is a tort which is not maritime in nature, and hence was not cognizable in admiralty at the time this suit was filed, even though under the Extension of Admiralty and Maritime Jurisdiction Act of 1948, 46 U.S.C.A. § 740, it would be cognizable now.

Respondent contends: first, that the pipe line was no part of the dredge, and hence could not be considered a vessel; and second, that one end of the pipe line was shoreborne, and hence was peculiarly not maritime in nature.

■ Although the pipe line of a dredge is not a vessel, nevertheless it is a marine object; and I think the decisions under Section 1333, Title 28 U.S.C., relating to admiralty jurisdiction of district courts, make it clear that at the time this libel was filed, a proceeding in rem could have been maintained against a vessel for damages resulting from the collision of such vessel with other marine objects, not vessels, such as beacons, dikes, log rafts, a power cable while afloat, a pontoon wharf, and, as here, a dredge pipe line.

As to the admiralty status of the discharge pipe line of a dredge prior to the Act of 1948 (supra), the case of "The San Valerio", 5 Cir., 255 F. 52, was a libel in admiralty against the S. S. "San Valerio" for damage to such a pipe line. In that case Judge Hutcheson entered a decree for the libelant, which decree was affirmed by the Court of Appeals for the Fifth Circuit. See also Kibadeaux v. Standard Dredging Co., 81 F.2d 670.

■ Upon the question of negligence of the "Kirkenes", it was stated in "The San Valerio", supra [255 F. 53], "The collision in question being one between a moving vessel and an anchored pipe line, the location of which was known, there is a presumption of fault on the part of the moving vessel. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; The Charles Hubbard, [6 Cir.], 229 F. 352, 143 C.C.A. 472."

■ It is adequately established by the testimony that "Rules to Prevent Collisions of Vessels and Pilot Rules for Inland Waters", as of May 30, 1946, were violated by the "Kirkenes", in that she failed to wait for the passing signal from the dredge. In addition to this, it is elementary law that the mere fact a stationary legal object which blocks a channel is not immediately removed, gives no license to an oncoming vessel to damage the object. It was the duty of the "Kirkenes" to navigate at such speed and in such manner as to enable her to await the passing signal from the dredge.

The respondent has requested, in connection with its amended answer, that libelant admit the genuineness of the following documents:

(a) Copy of the entry manifest of the "Kirkenes" when she entered Port Arthur, Texas, on May 28, 1946.

(b) Copy of the clearing and outbound manifest of the "Kirkenes" when she cleared Port Arthur, Texas, on May 30, 1946.

(c) Copy of crew list attached to outward foreign manifest, which was filed by the "Kirkenes" with the Collector of Customs, Port Arthur, Texas, on May 30, 1946.

Each one of these documents is a photostat of a copy (not a photostat of the original); is attached to the request for admission; and bears the photostated notation:

"A true copy of the original,
   I certify
            A. A. Gunter (Signature)
            Ass't Coll. of Customs"

Assumedly Mr. Gunter is Assistant Collector at Port Arthur.

The libelant objects:

(1) That the provisions of Admiralty Rule 32B(a), 28 U.S.C., have not been complied with, in that libelant had less than ten days after service within which to answer, since it was served with the request for admission by mail on September 8, 1951, and the trial date had been fixed for September 18, 1951; and

(2) That libelant has no knowledge on which to base admissions or denials; and that the respondent may have the benefit of the provisions of 28 U.S.C. § 1733(b), dealing with the admissibility in evidence of properly authenticated copies of any records or documents of any department or agency of the United States.

The period of time to admit or answer was not designated in the request for admission, although Rule 32B(a) indicates it should be designated therein, and provides a minimum of ten days. The Admiralty Rules do not say how this ten days or any time period shall be computed.

There is a growing tendency in the district courts to turn to the Rules of Civil Procedure, 28 U.S.C., where the Admiralty Rules are silent. Benedict (Sixth Edition, Vol. 3, Sec. 386c) says that Rule 32B(a) of the Admiralty Rules (effective 1939) is identical with Rule 36 of the Rules of Civil Procedure (effective 1938). Turning to the Rules of Civil Procedure, Rule 6(a) tells how this period shall be computed. Computing the minimum period thus, the date of the trial was the tenth day.

In any event, libelant's answer, with exceptions to the request for admission, was filed September 12, 1951, six days before trial, and by filing its exceptive answer, it apparently has waived any technical objection on the question of time to admit before trial.

As to libelant's second exception that it has no knowledge on which to base admission or denial, although this objection appears technical in view of the obvious documentary nature of the exhibits, it is certain that verification can more easily be made by respondent, as suggested by libelant, under the provisions of 28 U.S.C. § 1733(b). Under that section, the question arises: Are these photostatic copies properly authenticated?

The revision notes on that section tell us: "Numerous provisions with respect to authentication were omitted as covered by Rule 44 of the Federal Rules of Civil Procedure." Under Rule 44 of the Civil Rules, these photostats should have been accompanied with a certificate that the attesting officer had the custody of these records.

In view of the findings of fact and conclusions of law as set forth herein, I believe the admissions sought are of no substantial importance. However, in the interlocutory order, respondent will be granted time within which to authenticate the copies in question should it care to do so for purposes of appeal.

### Findings of Fact.

1. The T/S "Kirkenes", though under Norwegian registry, was owned by the United States at the time she collided with the pipe line of the dredge "G. A. McWilliams", and at the time libel for the resulting damage was filed.

2. The "Kirkenes" was employed as a merchant vessel.

3. The "Kirkenes" was in the harbor of New York and within the territorial waters of the United States at the time the libel was filed.

4. The McWilliams Dredging Company owned and operated the dredge "G. A. McWilliams", and the Company, organized under the laws of the State of Illinois, had its principal place of business in New Orleans, Louisiana, within the territorial jurisdiction of the United States District Court for the Eastern District of Louisiana, at the time the "Kirkenes" struck the pipe line of said dredge, and at the time libel for the resulting damage was filed.

5. The dredge "G. A. McWilliams" and its pipe line on May 30, 1946, were located in a place where they had a legal right to be.

6. The negligent operation of the "Kirkenes" was the proximate cause of the collision and of the resulting damage.

Conclusions of Law

1. The collision was a maritime tort, coming within the admiralty jurisdiction of this court under the Suits in Admiralty Act.

2. The respondent, United States, is liable in damages for the tort.

The appropriate order will be entered referring this cause to a commissioner to ascertain and compute the amount of libelant's damages, and to report thereon to the court.