**TRINIDAD CORPORATION,**
Libelant,

v.

**AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, Inc., Respondent.**

United States District Court
S. D. New York.
April 12, 1955.

Bingham, Englar, Jones & Houston, New York City, for libelant. Leonard J. Matteson and Julian S. Gravely, Jr., of counsel.

Kirlin, Campbell & Keating, New York City, for respondent. Ira A. Campbell and Elmer C. Maddy, New York City, of counsel.

PALMIERI, District Judge.

This action involves the interpretation and application of certain provisions of a protection and indemnity insurance policy executed by the respondent in favor of the libelant, insuring against certain risks, liabilities and expenses with respect to the libelant's vessel, the Fort Mercer. The facts are not in dispute.

The circumstances which gave rise to this suit were substantially as follows: On October 2, 1949, while the insurance policy was in force, the S. S. Fort Mercer was proceeding in the Houston Ship Channel, outward bound from the port of Houston, Texas. The hydraulic dredge, George W. Catt, was then engaged in widening and deepening the navigable channel. Connected to it and for the purpose of disposal of spoil ashore was a pipeline. The dredge was assisted by the tugs Irma and Kathy and six barges. The tugs were acting as dredge tender to shift the pipelines, pontoons, barges and the dredge. Two of the barges were equipped with derricks which were used to put the pontoons, pipelines and other equipment in place. The others were water, oil or storage barges. The discharge pipeline supported by pontoons ran out in a northerly direction, directly astern from the dredge, for a distance of 1200 or 1300 feet. At this point, the pipeline turned down from the pontoon to the bottom of the channel and ran in an easterly direction across the Houston Ship Channel to a disposal area on the opposite shore, where silt pumped by the dredge from the channel bottom was deposited.

The pontoons supporting the pipeline consisted of metal cylinders 38 feet long and 52 inches in diameter. They were laid at right angles to the direction of the discharge pipe and were held together by two lines of strongbacks separated by cross beams and secured to the top of the pontoons. The strongbacks and cross beams were timbers 10 inches by 10 inches in cross section; the strongbacks were 32 feet in length. The line of pontoons and strongbacks was held in place by anchors placed at intervals along the line. The discharge pipeline was carried on top of the pontoons between the two lines of strongbacks, and it was made up of sections of pipe 40 feet long and 27 inches in diameter. The ends of the pipe sections were flanged and joined together by nuts and bolts. To permit flexibility ball joints were inserted at intervals. The pipeline, pontoons, strongbacks, etc. had been towed on the water to the location of the dredging by the tugs operating with the dredge and had been placed in position and assembled by the tugs and the derrick barges. One end of the pipeline was connected to the discharge pipe of the dredge.

The dredge was in position on the west side of the Houston Ship Channel, in the vicinity of Morgan Point and facing in a southerly direction. The shrimpboat Icie, a vessel 30 feet in length, was moored to the east side of Cook's Dock, a structure on the west shore of the Houston Ship Channel directly west of the pontoon line running from the stern of the dredge. The outboard side of the Icie was about 75 feet inshore of the pontoon line.

The Fort Mercer, a vessel about 525 feet in length, and assisted by the tug Ajax, was in the vicinity of Morgan Point when, due to the negligence of those in charge of her, she was allowed to leave the regular deep water channel, sheer to starboard and enter the area being dredged by the George W. Catt. As a result, the bow of the Fort Mercer

was grounded ahead of and to the east of the dredge. In pulling her astern and in turning her bow to port in order to get her back in the regular deep water channel, the stern of the Fort Mercer was negligently permitted to come into collision with the floating pontoon line at a distance of about 500 feet from the stern of the dredge, thus damaging the pontoons and pipeline and forcing one of the pontoons into the Icie. The collision caused the Icie to sink. There was no contact between the Fort Mercer and the Icie nor between the Fort Mercer and any object other than the pipeline or pontoons or their connections.

The libelant, by reason of its ownership of the Fort Mercer, thereafter was compelled to pay certain sums for damages and expenses both for the claims for damage to the pontoon line and equipment, and the claims for damage to the Icie. The reasonableness of these sums is not disputed. The respondent denies responsibility under the insurance policy.

The basic issue is whether the collision of the Fort Mercer with the pontoons, and the forcing of the pontoons into the shrimpboat Icie, constituted "collision of the insured vessel with another vessel or craft" within the meaning of the policy issued by respondent. If it was not, the libelant is entitled to recover in this action for damage to the pipeline and the Icie. For under the policy respondent agreed to cover:

"(4) Liability for loss of or damage to any other vessel or craft, or to property on board such other vessel or craft, caused otherwise than by collision of the insured vessel with another vessel or craft," and

"(5) Liability for damage to * * any fixed or movable object or property whatsoever, except another vessel or craft or property on another vessel or craft * * *."

The libelant's position is that the collision of the Fort Mercer with the pipeline and the resultant collision of a pontoon with the Icie, is not a "collision of the insured vessel with another vessel

or craft" and that the damage to the pipeline is not damage to "another vessel or craft or property on another vessel or craft." The respondent's contention is that the pipeline was a part of the dredge and, together with the dredge, constituted a vessel or craft, and consequently, that the damage to the Icie and the pipeline was damage which was excluded by the exceptions in the clauses above quoted.

 In my opinion the pipeline was not a vessel or craft or property on a vessel or craft.

 Respondent does not contend that the pipeline in and of itself was a vessel. See Cope v. Vallette Dry-Dock Co., 1887, 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501; Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co., 1926, 271 U. S. 19, 46 S.Ct. 379, 70 L.Ed. 805. But respondent's argument is that while the pipeline may not have been a vessel, it must be considered a part of the dredge's equipment and a part of the dredge during the time it was attached thereto and being used by the dredge. There is, of course, no question that the dredge itself, engaged as it was in improving a navigable channel, was a vessel. Ellis v. United States, 1907, 206 U.S. 246, 259, 27 S.Ct. 600, 603, 51 L.Ed. 1047; Bowers Hydraulic Dredging Co. v. Federal Contracting Co., D.C.S.D.N.Y.1906, 148 F. 290, affirmed, 2 Cir., 153 F. 870, certiorari denied, 1907, 207 U.S. 587, 28 S.Ct. 255, 52 L.Ed. 352.

To sustain its contention that the collision with the pontoons and pipeline was a collision with a vessel, the respondent relies principally upon In re Margetts and The Ocean Accident and Guarantee Corp., [1901] 2 K.B. 792. In that case the question arose under the terms of a policy of marine insurance. The policy provided coverage for collision between any tug of the assured and any vessel. The insured tug came into collision with an anchor attached by about 20 or 30 fathoms of chain to a schooner. As a result of striking the anchor, the tug sank. The insurance company contended

that the anchor was not part of the schooner and that the striking of it by the tug was not a collision between the tug and the vessel. The Court held, to the contrary, that since the anchor was an appurtenance of the anchored vessel, the collision of the insured tug with the anchor was a collision "with a vessel" within the terms of the policy.

The anchor was there regarded by the Court as "an extended portion" of the vessel to which it was attached. Phillimore, J. (at pp. 796–7) said:

"There are many movable things about a ship which may be treated as appurtenances of the ship. In a narrow view it may be said that the hull, masts, yards, standing rigging, bridge (in the case of a steamer) form the ship, and that these alone are parts of the ship; but if there be a collision with projecting booms, or boats at the side, or with the anchor at the bows, no one could doubt that in the fair use of language it is a collision with the ship. A ship often extends her area by swinging boats over her side, or casting out her anchor, and, in my opinion, a collision with the anchor belonging and attached to the ship, although it be at a distance from her, is a collision with an extended portion of the ship * * *."

This decision, however, was later distinguished in the case of Bennett Steamship Co., Ltd. v. Hull Mutual Steamship Protecting Society, Ltd., [1913] 3 K.B. 372, affirmed [1914] 3 K.B. 57. In that case, the insured vessel collided with a fishing net which was being towed by a fishing vessel. The question was whether the liability of the insured vessel resulted from a collision with another vessel. The Court held that it did not and refused to extend the principle of the Margetts decision. Phillimore, L. J., one of the Judges who had participated in the Margetts decision, said at [1914] 3 K.B. 61:

"I am of the same opinion. Whenever any part of the tackle of a vessel is being used in connection with the vessel, although it may be outside the ambit of the hull, as the anchor or a boat towing astern or working ahead to warp the vessel, it may just as well be said to be a part of the vessel when there is a collision with it as if it were still on board the vessel itself. Upon that ground the case of In re Margetts and Ocean Accident and Guarantee Corporation * * * was properly decided. Nets, however, are not a part of the ship in that sense, nor are they things which it is necessary for her to have and without which she could not prudently put to sea."

Like the net of a fishing vessel it would seem that while the pipeline involved in this case was an appurtenance of the dredge in performing her dredging operations, it was in no sense an essential equipment of the dredge as a vessel. The pipeline here did not move with the dredge in the same sense as its hull or anchor. The pipeline and pontoons, once having been towed to the location of the dredging work by the attending tugs, were placed in position and assembled by the tugs and the derrick barges. Once the connection with the dredge was established, both the dredge and the pipeline were required to remain at anchor at an established location for the purpose of permitting the pumping operations to be performed. It follows, therefore, that under Bennett Steamship Company, Ltd. v. Hull Mutual Steamship Protecting Society, Ltd., supra, the pipeline was not a part of the vessel. This conclusion is supported by McWilliams Dredging Company v. United States, D.C., 105 F.Supp. 582, 588, 1952 A.M.C. 1420, 1429, where in referring to a collision with a pipeline like that in this case, the Court said that "the pipeline of a dredge is not a vessel." The Court held that it was a "marine object," damage to which was properly the subject of admiralty jurisdiction but that is not the point here.

The libelant is entitled to recover from the respondent the sum of $5,968.56 (the amount of its damages, liabilities and

expenses in connection with the aforesaid accident in the sum of $6,168.56 less the sum of $200, the total amount of the deductions applicable to claims under Paragraphs (4) and (5) of the said policy of insurance according to the terms thereof), with interest from May 1, 1950, together with costs.