**Mildred A. NILSEN**

v.

**MUTUAL MARINE OFFICE, INC.**

**MUTUAL MARINE OFFICE, INC.**

v.

**Mildred· A. NILSEN et al.**

**Civ.A. Nos. 75–1762–F, 75–2402–F.**

United States District Court,
D. Massachusetts.

April 5, 1977.

Alan R. Hoffman of Kaplan, Latti & Flannery, Boston, Mass., for Mildred A. Nilsen.

Solomon Sandler of Sandler, Sandler & Laramee, Gloucester, Mass. and John B. Shields of Bigham, Englar, Jones & Houston, New York City, for Mutual Marine Office, Inc.

## OPINION

MALETZ, Judge.[1]

### Jurisdiction

*Nilsen v. Mutual Marine Office, Inc.,* Civil Action No. 75–1762–F, is a bill to reach and apply the proceeds of an "excess" policy of insurance, written by the defendant, Mutual Marine Office, Inc. (Mutual Marine) to satisfy the judgment debt of its insured, Lofoten Island Fishing Corporation. The plaintiff, Mrs. Nilsen, is a citizen of Massachusetts, while the defendant corporation, Mutual Marine, is a citizen of New York. This court has diversity jurisdiction over this case pursuant to 28 U.S.C. 1332. Additionally, this case concerns a maritime contract, i. e., a marine insurance policy. Thus, the court has jurisdiction in admiralty over the case pursuant to 28 U.S.C. 1333.

*Mutual Marine Office, Inc. v. Nilsen,* Civil Action No. 75–2402–F, is a Petition for Declaratory Judgment brought by Mutual Marine to determine that it is not liable under its "excess" policy of insurance. As in Civil Action No. 75–1762–F, diversity jurisdiction exists since Mutual Marine, plaintiff in No. 75–2402–F, is a citizen of New York and Mrs. Nilsen and Lofoten Island Fishing Corporation, the insured under the policy of excess insurance and a technical defendant, are citizens of Massachusetts.

### The Facts

The facts giving rise to the controversy are as follows: On January 29, 1967, Hagbart Nilsen died while a member of the crew of the F/V BRIGHTON, which was owned by the Lofoten Island Fishing Corporation (Lofoten Corp.). At the time of his death, Citizens Casualty Company of New York (Citizens Casualty) was the primary carrier for the first $90,000.00 and Mutual Marine was the excess carrier for the next $210,000.00. The Citizens Casualty policy contained a notice of claims clause, but the Mutual Marine policy did not.[2] The Mutual Maritime policy specifically referred to the existence of the Citizens Casualty policy, and Mutual Marine was aware of the fact that Citizens Casualty had the primary coverage. The insured, Lofoten Corp., gave appropriate and timely notice of the death of Hagbart Nilsen to the Massachusetts agent of Citizens Casualty. However, neither Lofoten Corp. nor its broker notified Mutual Marine of the death of Mr. Nilsen or of any claim by Mr. Nilsen's representative.[3]

On February 21, 1967, Mrs. Nilsen was appointed Administratrix of her husband's estate and she commenced suit against Lofoten Corp. in the Bristol County Superior Court of Massachusetts on December 4, 1967. The law firm of Kneeland and Splane appeared and defended the case on behalf of Citizens Casualty and Lofoten Corp. However, Citizens Casualty was placed in liquidation on June 17, 1971, and counsel withdrew soon thereafter.

Meanwhile, in January 1971, Mutual Marine received information that Hagbart Nilsen had died aboard the F/V BRIGHTON on January 29, 1967. Further, the great weight of the evidence—emphasized partic-

---

1. Judge of the United States Customs Court sitting by designation pursuant to 28 U.S.C. 293(b).

2. It is to be noted that in the period from 1966 to 1971, Mutual Marine wrote between 500 to 700 excess marine insurance policies a year or a total during that period of about 3,000 excess policies. Of these 3,000 policies, about 100 to 200 contained specific notice provisions. Such notice provisions were usually included by Mutual Marine when the primary insurance was very large (i. e., about $1,000,000) or there was a very large deductible. In addition, while not usual, there were instances where Mutual Marine included specific notice provisions in its excess policies even where the primary insurance was as small as $50,000 or $100,000.

3. The broker on the excess policy was Raleigh Watson whose office was in New Jersey. The broker was the agent of his customer, Lofoten Corp., and any negotiations about terms, time, conditions, exclusions or other provisions of a policy were made with the broker and seldom, if ever, was there direct contact between Mutual Marine and the insured, Lofoten Corp.

ularly by the exhibits in the record [4]—impels the conclusion that at approximately the same time in January 1971 that it learned about the death of Hagbart Nilsen, Mutual Marine learned about the action brought by Mrs. Nilsen against its insured, Lofoten Corp., in the Bristol County Superior Court. At that time, Mutual Marine decided to disclaim because it had received no notice of the origination of the claim of Hagbart Nilsen prior thereto and so informed the attorney for Citizens Casualty.

It is to be added that from the time its policy was issued, Mutual Marine knew that Citizens Casualty had written the primary policy of insurance on the F/V BRIGHTON. Also, shortly after June 17, 1971, Mutual Marine learned that Citizens Casualty had been placed in liquidation. Mutual Marine did nothing at that time to protect the interests of its insured, Lofoten Corp., in regard to the Nilsen claim. Indeed, Mutual Marine took no steps to review Citizens Casualty's file on the Nilsen claim although Citizens' office was within one-half mile of its own office. However, some seven months later, on January 27, 1972, Solomon Sandler, Mutual Marine's New England attorney, filed an appearance in the Bristol County suit as a counsel for the defendant Lofoten Corp. but withdrew that appearance on February 15, 1972. That suit culminated on April 17, 1973 when a default judgment in favor of Mrs. Nilsen against Lofoten Corp. was entered in the amount of $201,462.15. To this date, this judgment has not been satisfied.

Against this background, Mrs. Nilsen claims that as a judgment creditor she is entitled to have the proceeds of the Mutual Marine "excess" policy of insurance applied to the satisfaction of that judgment. Thus, she contends that Mutual Marine is presently liable to her in the amount of the excess coverage, i. e., $111,462.15 [5] (which represents the difference between the default judgment of $201,462.15 and the primary coverage of $90,000.00 under the Citizens Casualty policy). Mutual Marine denies liability and seeks a declaratory judgment to that effect.

### The Law

Turning now to the legal aspects, it is to be observed that at the trial, Mutual Marine introduced through its Loss Manager, Brice Leon, evidence of a "custom and practice" in the insurance business that the insured or his broker notify the excess carrier where there is a likelihood that a claim or loss will invade the excess. Building on this testimony, Mutual Marine contends that there are ample facts in the record to raise the presumption that the insured, Lofoten Corp., by itself or its broker, had knowledge of this custom and practice and that since notice was not given, Mutual Marine was within its rights to disclaim liability under its excess policy. Mrs. Nilsen claims, on the other hand, that (1) because the excess policy is unambiguous, Mr. Leon's testimony could not be used to vary its express written terms; and alternatively, (2) the testimony offered did not give rise to the level of a custom and practice which would bind the insured.

### I

At the outset, it is clear that the Mutual Marine policy contains absolutely no language which is ambiguous on the issue of notice and which could therefore be susceptible to a construction that would obligate the insured, in whose shoes Mrs. Nilsen stands, to notify the excess carrier, Mutual Marine. Mutual Marine has neither argued that such an ambiguity exists, nor has it pointed to any ambiguous contractual language in the policy. Under such circumstances, the law is clear that custom and practice evidence cannot be used to vary the provisions of the policy. In *Grace v. American Central Insurance Company*, 109 U.S. 278, 3 S.Ct. 207, 27 L.Ed. 932 (1883), the Supreme Court addressed this issue in

---

4. See, e. g., plaintiff's exhibits 6, 7, 8 and 10 in Civil Action No. 75–1762–F.

5. Together with costs and interest commencing April 17, 1973 until payment is made.

the following language (p. 283, 3 S.Ct. p. 210):

> An express written contract, embodying in clear and positive terms the intention of the parties, cannot be varied by evidence of usage or custom. In *Barnard v. Kellogg,* 10 Wall. 383, [19 L.Ed. 987], this court quotes with approval the language of Lord Lyndhurst in *Blackett v. Royal Exchange Assurance Co.,* 2 Cromp. & Jervis, 244, that "usage may be admissible to explain what is doubtful; it is never admissible to contradict what is plain." This rule is based upon the theory that the parties, if aware of any usage or custom relating to the subject-matter of their negotiations, have so expressed their intention as to take the contract out of the operation of any rules established by mere usage or custom. Whatever apparent conflict exists in the adjudged cases as to the office of custom or usage in the interpretation of contracts, the established doctrine of this court is as we have stated.

In 1870, some 13 years prior to the decision in *Grace,* the federal court in Massachusetts considered the same issue (which arose in connection with a marine insurance contract) and resolved it the same way. *Hearn v. Equitable Safety Ins. Co.,* 11 Fed. Cas.No.6299, p. 963 (C.C.Mass.1870). Respecting the construction of the policy, the court in *Hearn* wrote (11 Fed.Cas., p. 964):

> Where the parties express their intention in clear and unambiguous language, courts of justice are bound by what the parties have written, . . . Evidence of usage in such a case cannot be admitted, as the terms of the contract are incapable of any other meaning than that which is plainly expressed by the language which the parties have employed. . . . Contract is one thing, but usage or evidence of usage is another, and a very different thing. Usage will not make a contract, nor is the evidence of it admissible to incorporate into a contract any right or privilege to either not conceded or secured by its terms.

These early applications of what is basically the parol evidence rule have been consistently followed. For example, in *Aetna Ins. Co. v. Sacramento-Stockton S.S. Co.,* 273 F. 55 (9th Cir. 1921), the court stated (p. 59):

> Error is assigned to the exclusion of evidence offered to show the general understanding among those engaged in marine insurance business and in the shipping business "in San Francisco and thereabouts" that a rider, such as is attached to the policy in suit, supersedes the terms of the policy and alone defines the risk. If the offer had been to prove that a term or expression used in a contract of insurance had received a particular construction by the general consent of the mercantile world, a different question would be presented; but the offer was to prove a general understanding of the meaning of an insurance contract in San Francisco and thereabouts. The evidence was clearly incompetent. The contract speaks for itself. It is neither ambiguous nor obscure.

In *City General Insurance Co. v. St. Paul Fire & Marine Ins. Co.,* 215 F.Supp. 524 (S.D.N.Y.1953), a case involving a dispute between a primary and excess carrier, the court held that "the terms of defendant's policy and loan receipt are unambiguous and hence cannot be varied by parol evidence of custom and usage." *Id.* at 529.

More recently, the First Circuit in *Zavota v. Ocean Accident & Guarantee Corporation,* 408 F.2d 940 (1969), upheld the exclusion of custom and practice testimony, stating, "the policies admit of no ambiguity, latent or patent, and oral evidence will not be received to create ambiguity where none existed before." *Id.* at 943. See also, e. g., *United States v. Nance,* 430 F.2d 662, 663 (9th Cir. 1970).

The short of the matter is that the insurance contract in question was drawn by Mutual Marine; if it desired prompt notice of claims from the insured, it could easily have drafted a clause requiring such notice. In fact, the record shows that Mutual Ma-

rine did indeed include specific notice of claim clauses in some of its excess policies, even where the amount of primary coverage was approximately the same or less than that involved here. See note 2, *supra*. Moreover, the contract in question between the insured and Mutual Marine was not silent on the issue of notice. For example, the policy contained several clauses concerning notice of cancellation including a provision that "[e]ither party may cancel the policy by giving fifteen days' notice in writing." Further, the policy made specific reference to the Citizens Casualty policy which in turn had several notice of claim clauses.

Nor are the two cases on which Mutual Marine places major reliance applicable here. The first of these cases, *Turner v. Donovan,* 3 Cal.App.2d 485, 39 P.2d 858 (1935) concerned a dispute between two lawyers as to what division of fees should be made, in the absence of a written agreement, where one lawyer forwarded legal business to another. It was held in that situation that testimony bearing on custom and usage as to the division of fees under circumstances where *no written agreement* existed was admissible in determining the rights of parties whose relations came within the usage. It is thus apparent that the case does *not* support Mutual Marine's basic argument to the effect that evidence of custom and practice may be relied upon to add to a *written* contract a particular provision which had been purposely *omitted* by the party drafting the contract.

Misplaced also is Mutual Marine's reliance on *North Shore Improvement Co. v. New York P. & N. R. Co.,* 130 Va. 464, 108 S.E. 11 (1921) which concerned the interpretation of a railroad bill of lading. Significantly, the specific holding in that case was that custom and usage could *not* override the terms of the bill of lading.

## II

But even assuming *arguendo* that the testimony of Mr. Leon as to the "custom and practice" in the insurance business was not contrary to the parol evidence rule, that testimony did not rise to the level of a custom and practice that would bind the insured in any event. Relevant in this regard is *Rose and Lucy, Inc. v. Resolute Insurance Company,* 249 F.Supp. 991 (D.Mass.1965) which was an action to recover on a policy of marine hull insurance issued by the defendant to the plaintiff covering the vessel ROSE AND LUCY in the amount of $30,000 against sinking by collision, among other things. The vessel was lost at sea after a collision and the sole defense was that the policy was allegedly void for fraud in that plaintiff, in applying for insurance on the vessel, assertedly misrepresented its value, which according to defendant was $60,000. To support its position, defendant offered custom and practice evidence to explain the meaning of a specific contractual term under an application for marine insurance in the amount of $30,000 which defendant contended constituted a representation that the vessel's fair market value was about $30,000. The court had the following to say about the custom and practice evidence thus proffered (249 F.Supp. at 992):

> Respondents' position is that under a practice and custom in the trade, an application for insurance on a vessel in the amount of $30,000, without any express statement as to the value of the vessel, is understood as a representation that the vessel's fair market value is approximately $30,000. The evidence for the existence of such a custom was the testimony of Marshall and of Enos, who issued the policy on behalf of respondent, that there was such a custom or practice. Enos, however, was vague about how, when or where he first learned of such a practice. While he testified that he had an extensive library of publications dealing with marine insurance, he cited no reference in that literature to such a custom. There was no evidence from any independent witness as to the existence of such a custom. On the evidence presented the court cannot find that the alleged custom or practice ever did exist.

*Even if there had been such a custom or practice it would not bind libelant.* No one ever told Parisi that such a custom existed and he had no actual knowledge that it did. *There was no evidence that such a custom, if it did exist, was so widespread and notorious that there can be any presumption that persons outside the insurance business were aware of it. Howard v. Great Western Insurance Company,* 109 Mass. 384, 389. *Where a custom or practice of the insurance business is not known to the purchaser of insurance and not shown to be commonly known outside the insurance business itself, this court cannot hold that the custom is effective* . . . [Emphasis added.]

The proffered evidence in the present case is clearly no more probative than that in *Rose and Lucy.* Mr. Leon, only, and no impartial witness testified to the alleged custom and practice. Moreover, he conceded that some excess policies, including some in the same approximate amount as the policy here in question, contained specific notice clauses, despite the existence of the alleged custom and practice. And he gave no specific instance of any occasion where Mutual Marine was notified by an insured of a claim on an excess policy where the policy did not contain a notice of claim provision.

■ More importantly, there was not an iota of testimony which indicated that the insured, Lofoten Corp., which was located in Massachusetts, or the broker Watson, who was located in New Jersey, had any knowledge of the alleged custom and practice in the New York insurance industry. Indeed, Mr. Leon testified specifically that neither he nor anyone at his direction took any steps to communicate the so-called custom and practice to the insured or asked the broker Watson to do so. Finally, there was not a shred of evidence to indicate that the "custom and practice" was so widespread that anyone outside of the New York insurance industry should be presumed to know of it. Bearing repetition, in view of these

considerations, is what this court said in *Rose and Lucy, supra,* 249 F.Supp. at 992: "Where a custom or practice of the insurance business is not known to the purchaser of insurance and not shown to be commonly known outside the insurance business itself, this court cannot hold that the custom is effective . . ." To the same effect, the court stated in *North Shore Improvement Co. v. New York P. & N. R. Co., supra,* 108 S.E. at 12: "[T]here is no sufficient evidence that this usage of the company, designated 'custom,' was *so general as to charge the plaintiff with knowledge thereof* . . ." [Emphasis added.] And in *Pennington v. Styron,* 270 N.C. 80, 85, 153 S.E.2d 776, p. 780 (1970), the court observed:

To be admissible in evidence "a custom must be shown to have been so general that a contracting party will be presumed to have had knowledge of it, in order to make it a part of the contract . . ."

### III

■ Lastly, other considerations aside, it must be concluded that under the circumstances of this case, Mutual Marine is estopped from relying on the defense of lack of notice. For the record establishes that Mutual Marine did in fact receive notice of Mr. Nilsen's death and the Bristol Superior Court lawsuit over two years before the 1973 judgment in that action and thus was not prejudiced by the lack of an earlier receipt of such notice. See Annot. 24 ALR 3d 1030 § 11 (1969). The following facts are relevant in this regard:

(1) From the date its policy became effective in April 1966, Mutual Marine was aware of the fact that Citizens Casualty had the primary policy covering Lofoten Corp.

(2) Citizens Casualty was given timely notice of the Nilsen claim and conducted a thorough investigation into the circumstances of Mr. Nilsen's death.

(3) In January 1971 Mutual Marine learned about the death of Mr. Nilsen and

**1382**

about the lawsuit brought by Mrs. Nilsen against its insured, Lofoten Corp., in the Bristol County Superior Court, but decided to disclaim because it had not received notice of the origination of the claim of Mrs. Nilsen.

(4) Within days of June 17, 1971, the date Citizens Casualty was placed in liquidation, Mutual Marine learned of this development but did nothing to protect the interests of its insured, Lofoten Corp. (Indeed, Mutual Marine did not even seek to review Citizens Casualty's file on the Nilsen claim, although Citizens' office was within one-half mile of its own office.)

(5) Finally, Solomon Sandler, Mutual's New England attorney, filed an appearance in the Bristol County suit on January 27, 1972 as a counsel for the defendant Lofoten Corp., but then withdrew that appearance on February 15, 1972.

When it is considered in short (1) that in January 1971—over two years before the 1973 default judgment in the Bristol Superior Court lawsuit—Mutual Marine did in fact learn about Mr. Nilsen's death and the lawsuit brought in the Bristol County Superior Court against its insured, Lofoten Corp., and (2) that Citizens Casualty had conducted an extensive investigation which, after its liquidation, would undoubtedly have been available to Mutual Marine upon request, Mutual Marine was not only not prejudiced by lack of an earlier receipt of notice, it is estopped from relying upon any defense of lack of notice which it would otherwise have had.

For the foregoing reasons, judgment in Civil Action No. 75–1762–F will be entered for Mrs. Nilsen in the amount of $111,462.15 with interest from April 17, 1973 and costs. In Civil Action No. 75–2402–F, judgment will be entered dismissing Mutual Marine's Petition for a Declaratory Judgment.