**COMMERCIAL UNION INSURANCE COMPANY, Plaintiff,**

v.

**CHARLESTON MARINE LEASING COMPANY and Marinex Construction Company, Defendants.**

**Civ. A. No. 2:93cv916.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Feb. 9, 1994.

John Early Holloway, Andrew Jackson Timms, Hunton & Williams, Norfolk, VA, for plaintiff.

Martha Martin Poindexter, Guilford D. Ware, Crenshaw, Ware & Martin, Norfolk, VA, for defendant.

## OPINION AND ORDER

DOUMAR, District Judge.

This is a declaratory judgment action filed by Commercial Union Insurance Company ("CU"), seeking a judgment declaring that CU is not obligated to indemnify or defend Charleston Marine Leasing Company or Marinex Construction Company (Charleston Marine Leasing Company and Marinex Construction Company to be referred to jointly as "Marinex") for any liabilities arising as a consequence of the collision between pontoons or pipes of the Dredge ARLINGTON and the F/V CAROLINA DREAM, a fishing vessel, in the Chesapeake Bay. The gravamen of the dispute is whether the pontoons or pipes were covered under the Protection and Indemnity (P & I) Policy issued by CU to Marinex.

Currently before the Court is CU's Motion for Summary Judgment. The parties have submitted briefs and appeared before the Court in oral arguments on the present motion. Therefore, the motion is ripe for disposition by the Court.

### I. *Facts and Procedural History*

Marinex is in the marine construction business and owns or operates certain marine construction equipment including the Dredge ARLINGTON. F. Hammond Johnson, the president of Marinex[1], contacted Jimmie R. Scruggs of Reliable Insurance Company Group, Inc. in September, 1991, to obtain hull and P & I insurance coverage for the watercraft operation of Marinex, including the Dredge ARLINGTON, its pipes and pontoons. Johnson Aff. at ¶ 2. Johnson provided Scruggs with a single schedule of property to be covered by one or all of the policies. *Id.* at ¶ 3. The schedule listed various vessels, including the Dredge ARLINGTON, and listed certain pipes, lines, and pontoons used exclusively on the Dredge ARLINGTON. Ex. A to Johnson Aff.

Mr. Scruggs contacted Wanda Groover, an underwriter at U.S. Fire Insurance Company ("U.S. Fire") (which was later bought by CU) to inquire about policies for port risk covering hull and P & I for certain equipment. Groover Aff. at ¶ 2. Scruggs provided Groover photographs of the Dredge ARLINGTON in which no pontoons or pipes were present. Groover Aff. at ¶ 2; Ex. A to Groover Aff. Several days later, Scruggs sent Groover a memorandum seeking P & I, hull, tower's liability, crew, comprehensive general liability, wreck removal and environmental coverage for various equipment.

Scruggs provided Groover with the single schedule of the equipment to be covered by one or both of the policies. Scruggs Aff. at ¶¶ 5, 7. According to Groover, Scruggs informed Groover that the cargo, pipes, pontoons, ball joints and draglines listed on the schedule provided by Scruggs were items to be stored on land, and were therefore "contractor's equipment" to be charged the "standard contractor's equipment rate of $1.00 per thousand." Supp. Groover Aff. at ¶ 2. That the pontoons, pipes and other equipment were to be stored on land is shown in the notations which Groover made to Scruggs' schedule and the resulting premiums charged for the pontoons, pipes, and other equipment. *Id.*; Ex's. C, D to Groover Aff; Hull Policy. Groover sent Scruggs an estimate of the premiums for the Hull and P & I Policies separately. The Hull Policy quoted the premium for storage of the pontoons and pipes on land, but the P & I Policy did not specifically list or quote a deductible or premium for the pontoons or pipes of the Dredge ARLINGTON. Groover Aff. at ¶ 3; Ex. D to Groover Aff. Scruggs called Groover to finalize the insurance policies and to withdraw his request for coverage for several of the vessels listed on the schedule provided. Groover Aff. at ¶ 4.

Groover sent Hull and P & I Policies to Scruggs on or about September 29, 1991. *Id.* The Hull Policy referenced an attached schedule of vessels and equipment covered

---

**1.** Johnson is the president of both Charleston and Marinex.

by the policy. The schedule specifically listed the Dredge ARLINGTON, its pipes, and pontoons separately, and quoted a value, deductible, and a premium for each item. The P & I Policy included a different schedule which listed certain vessels, including the Dredge ARLINGTON, but did not list or specifically describe lines, pontoons, or other equipment.[2] *Id.* A port risk endorsement was attached and was to form a part of every portion of the policy.[3] Scruggs accepted the policy without any objection or comment. *Id.*

The next year, on September 29, 1992, Scruggs renewed the Hull and P & I Policies with CU, which had bought U.S. Fire. Scruggs requested changes, which resulted in the removal of the port risk endorsement, modification of the navigation warranty, and increase in the premiums for the vessels on the Hull Policy. Groover Aff. at ¶ 5. However, the premium under the Hull Policy for the pontoons, pipes, and equipment did not increase but remained at the "contractor's rate" of "$1 per thousand."

Separate Hull and P & I Policies were issued effective September 29, 1992. The policies were identical in all other material aspects to the former policies, and referenced the same (separate) schedules for hull and P & I coverage.

On November 19, 1992, after Marinex had concluded its dredging operations under a contract, Marinex attempted to move a flotilla of its equipment, under tow of the Tug LADY JANICE, from Fisherman's Island to the Port of Hampton Roads. The flotilla resembled a railroad train with its many cars. The flotilla was led by the Dredge ARLINGTON with a spud barge, followed by the Deck Barge NEIL loaded with dredge

equipment, then the Deck Barge PATRICK loaded with an anchor, ball joints and other equipment, then the Fuel Barge No. 11, Crane Barge 30B with a thirty-ton crawler crane, then the Tug LAURA (not operational), then sixteen 500′ sections of steel submerged pipe rafted together (8,000 feet total), then four 500′–600′ sections of steel pontoon pipe along with pontoons (2,100 feet total), then approximately 4,000 feet of plastic pipe, then nineteen loose pontoon tank assemblies rafted together, and an anchor barge. Barto Aff. at ¶ 4.

The pontoons and pipes were owned by Marinex to be used exclusively with the Dredge ARLINGTON, the only dredge owned by Marinex. However, while they were being towed in the flotilla, the pontoons and pipes were not in any way connected to the dredge itself. In fact, as described above, the Dredge ARLINGTON was situated at the front of the flotilla, while most if not all of the pontoons and pipes were located at the rear of the flotilla.

While the flotilla was in the Chesapeake Bay, the crane barge with the thirty-ton crawler crane capsized, causing the flotilla to break up and setting a work float, dredge pipe, and pontoons adrift. On November 20, 1992, the F/V CAROLINA DREAM struck an object in the York Spit Channel of the Chesapeake Bay identified as either floating pipe or a pontoon owned by Marinex. The F/V CAROLINA DREAM sank as a result of the collision.

On January 28, 1993, the owner of the Tug LADY JANICE, Eastern Shore Diving and Marine Services ("Eastern Shore"), filed a limitation of liability proceeding in the United States District Court. Owners of the F/V CAROLINA DREAM filed a claim in the limitation proceeding and a cross-claim

---

2. The schedules for P & I Policy and the Hull Policy are reproduced in the Discussion, *infra.*

3. The port risk endorsement stated, in relevant parts:

To be attached to and form part of ALL portions of this policy

This insurance is subject to the following warranties:

4. This vessel(s) shall be laid up at *Deyten's Shipyard, Wando River, S.C.*

If the vessel(s) commences or proceeds on a voyage during the terms of this insurance, all coverage under this policy on said vessel(s) shall terminate as soon as the vessel(s) leaves her moorings to depart from the above named port.

against Marinex seeking damages in the amount of $885,000. The first mate aboard the F/V CAROLINA DREAM filed a claim in the limitation proceeding for $11,000 for alleged losses of personal property on board the fishing vessel. A seaman serving on the fishing vessel filed a claim against the limitation fund and a cross-claim against Marinex seeking personal injury damages in the amount of $2,000,000. Finally, Eastern Shore filed a counterclaim against Marinex seeking indemnity or contribution for any liability imposed upon it as a result of the collision between the F/V CAROLINA DREAM and the pontoon or pipe.

CU is defending Charleston and Marinex in the limitation proceedings under a reservation of rights. However, CU has informed Charleston and Marinex that the P & I Policy does not provide coverage for any liabilities arising from ownership or operation of the dredge pipe or pontoons. CU now seeks summary judgement declaring that the P & I Policy does not cover the dredge pipe or pontoons in regard to this incident.

## II. *Analysis*

### A. Summary Judgment Standard

Summary judgment is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate an absence of a general issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Once this burden is met, the non-moving party must, by affidavits or other proof, set forth sufficient facts showing that a genuine issue of material fact exists. *Catawba Indian Tribe v. State of South Carolina*, 978 F.2d 1334, 1339 (4th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1992). In deciding the motion, the Court must view all inferences drawn from the facts in favor of the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Catawba*, 978 F.2d at 1339. Moreover, the Court notes that, in this case, CU would bear the burden of proving that Marinex's pontoons were not covered under the P & I policy. *See Commercial Union Ins. Co. v. Ballowe*, 671 F.Supp. 421, 423 (W.D.Va.), *aff'd*, 833 F.2d 1004 (1987) (citing *U.S. Life Insurance Co. v. Mason*, 214 Va. 328, 200 S.E.2d 516 (1973)).

### B. Interpreting Insurance Policies on Summary Judgment

Although general maritime law governs maritime contracts, including contracts for maritime insurance, the state law of contracts governs where no federal statute or well established rule of admiralty exists.[4] *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 374, 99 L.Ed. 337 (1955).

Notwithstanding the general principle that insurance contracts are to be construed in favor of the insured, the Court must adhere to the plain meaning of contract terms, as this is the most authentic expression of the intentions of the parties. Parks, The Law and Practice of Marine Insurance and Average, at 113 (stating the general rule in interpreting marine insurance contracts); *Virginia Fire & Marine Ins. Co. v. Wells*, 83 Va. 736, 739, 3 S.E. 349, 351 (1887); *Sterling Ins. Co. v. Dansey*, 195 Va. 933, 81 S.E.2d

---

4. At oral arguments, counsel indicated that Marinex and Mr. Scruggs operate their businesses out of offices located in the State of South Carolina, and that CU operates its business out of the State of Georgia. These facts would indicate that the terms of an insurance contract allegedly entered into by these parties might be governed by the laws of one of those states. However, as neither of the parties to this suit has raised the choice of laws issue, and as both parties have suggested both in their memoranda and at oral arguments that Virginia law could apply in this case, the Court will apply Virginia law in deciding the issue of policy coverage in this case. The Court points out, however, that the Court is applying traditional principles of insurance law which are common to many jurisdictions.

446, 450 (1954); *Brand Distributors, Inc. v. Ins. Co. of North America,* 400 F.Supp. 1085, 1090 (E.D.Va.1974), *rev'd on other grounds,* 532 F.2d 352 (4th Cir.1976) (stating the traditional principal of Virginia contracts law).

The "plain meaning" of a contract term can not be discerned when the term is ambiguous. A word or phrase is "ambiguous" when:

> it is found to be of uncertain meaning by person of competent skill and information; that is, when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of customs, practices, usage and terminology as generally understood in the particular trade or business.

*Brand,* 400 F.Supp. at 1090 (citing *Ayres v. Harleysville Mut. Casualty Co.,* 172 Va. 383, 2 S.E.2d 303, 307 (1939) (other citations omitted)).

■ It is the duty of the Court to construe insurance contracts, *Brand,* 400 F.Supp. at 1090, and, under Virginia law, whether contract language is ambiguous is a legal question to be determined by the Court. *Nehi Bottling Co. v. All-American Bottling Corp.,* 8 F.3d 157, 161 (4th Cir.1993). If an ambiguous contract can be rendered clear by extrinsic evidence, it is the duty of the Court to construe the contract in light of the evidence. *Id.* at 161–62. "However, 'if the situation is such that fair-minded men might reasonably draw different conclusions [from the evidence], then the construction of the contract is for the jury under proper instruction from the court, even though the evidence [is] not conflicting.'" *Id.* (quoting *Geoghegan Sons & Co. v. Arbuckle Bros.,* 139 Va. 92, 123 S.E. 387, 389 (1924)). In such cases, a genuine issue of material fact exists and summary judgment should not be entered. *Cram v. Sun Ins. Office, Ltd.,* 375 F.2d 670, 673–74 (4th Cir.1967) (cited in *General Accid. Fire*

*and Life Assur. Corp, Ltd. v. Akzona Inc.,* 622 F.2d 90, 93 (4th Cir.1980)).

■ Accordingly, this Court must examine the language of the P & I Policy, in light of the Hull Policy and the entire agreement between these parties, from the standpoint of an individual cognizant of the practices and usage in this industry. The essential inquiry in examining these policies is to determine whether, by the plain meaning of the terms of the P & I Policy or its schedule and from the standpoint of an observer familiar with the custom and practices in this industry, the liability policy should be interpreted to include the dredge's pontoons or pipes while they were not attached to the dredge, being towed in the flotilla separate and apart from the dredge.

### 1. The Language of the Policies and Schedules

#### a. The P & I Policy

The P & I Policy provided P & I and excess collision coverage against liabilities arising out of Marinex's ownership of certain property. The P & I Policy which provided coverage at the time of the collision involved in this suit provides, in relevant part:

> In consideration of the premium and subject to the warranties, terms and conditions herein mentioned, this Company hereby undertakes to pay up to the amount hereby insured ... such sums as the assured, *as owner of the [see schedule]* shall have become legally liable to pay and shall have paid on account of:

> Loss of life of, or injury to, or illness of, any person;

> hospital, medical, or other expenses necessarily and reasonably incurred in respect of loss of life of, injury to, or illness of any member of the crew of the vessel named herein;

Loss of, or damage to, or expense in connection with any fixed or movable object or property of whatever nature.

P & I Policy, p. 1 [emphasis added]. Therefore, the language of the policy limits P & I coverage to that liability which the assured incurs as an "owner of" the property listed in the schedule.

The schedule to which the P & I Policy refers lists the property to be covered as follows:

### SCHEDULE OF VESSELS—P & I COVERAGE

| VESSEL | AMOUNT HEREBY INSURED | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Dredge: Arlington–1981 26' Steel | $1,000,000 | $1,000/$20,000 | $8,000 |
| Barges: "JOHN" 1981 120' Steel incl. crane | 1,000,000 | 1,000./$20,000 | 1,200 |
| "BILL"-deck barge 1981 10' steel | 1,000,000 | 1,000./$10,000 | 1,200 |
| "NEIL"-deck barge 1981 steel 120' | 1,000,000 | 1,000./$10,000 | 1,200 |
| "WIN YAH BAY"-spud barge 1982 130' steel | 1,000,000 | 1,000./$20,000 | 1,200 |
| Barge # 10-Fuel Barge 1958 75' Steel | 1,000,000 | 1,000./$ 5,000 | 1,200 |
| Barge # 11-Fuel Barge 1958 75' Steel | 1,000,000 | 1,000./$10,000 | 1,200 |
| Workboats: "LAURA"-Tug 1981 35' Steel | 1,000,000 | 1,000./$10,000 | 3,000 |
| "R.T."-Tug 1980 34' Steel | 1,000,000 | 1,000./$10,000 | 3,000 |
| "LITTLE JOHN"-Tug 1972 Steel | 1,000,000 | 1,000./$10,000 | 3,000 |
| "CHARLES L. GILLIKEN"-Tug | 1,000,000 | 1,000./$10,000 | 3,000 |
| "H.S. MITCHELL"-Tug | 1,000,000 | 1,000./$20,000 | 3,000. |

### b. The Hull Policy

The Hull Policy is designed to protect against damage to Marinex's equipment. The language in the clauses of the Hull Policy defines the insured "vessel" as including "her hull, launches, lifeboats, rafts, furniture, bunkers, stores, supplies, tackle, fittings, equipment, apparatus, machinery, boilers, refrigerating machinery, insulation, motor generators and other electrical machinery." Hull Policy clauses, lines 14–17. The Hull Policy references an attached schedule, which lists Marinex's pontoons separately from the Dredge ARLINGTON and other vessels, as follows:

## SCHEDULE OF VESSELS—HULL COVERAGE

| VESSEL | AMOUNT HEREBY IN- SURED | DEDUCTIBLE | PREMIUM |
|---|---|---|---|
| Dredge: Arlington-1981 26′ Steel | $900,000 | $50,000 | $14,175 |
| Barges: "JOHN" 1981 120′ Steel incl. crane | 150,000 | 20,000 | 1,575 |
| "BILL"-deck barge 1981 10′ steel | 30,000 | 10,000 | 315 |
| "NEIL"-deck barge 1981 steel 120′ | 30,000 | 10,000 | 315 |
| "WIN YAH BAY"-spud barge 1982 130′ steel | 150,000 | 20,000 | 1,575 |
| Barge # 10-Fuel Barge 1958 75′ Steel | 30,000 | 5,000 | 315 |
| Barge # 11-Fuel Barge 1958 75′ Steel | 60,000 | 10,000 | 630 |
| Workboats: "LAURA"-Tug 1981 35′ Steel | 40,000 | 10,000 | 840 |
| "R.T."-Tug 1980 34′ Steel | 40,000 | 10,000 | 840 |
| "LITTLE JOHN"-Tug 1972 Steel | 60,000 | 10,000 | 1,260 |
| "CHARLES L. GILLIKEN"-Tug | 50,000 | 10,000 | 1,050 |
| "H.S. MITCHELL"-Tug | 100,000 | 10,000 | 2,100 |
| Cargo consisting of but not limited to pumps, parts, cables, fuel oil, anchors | 120,000 | 10,000 | 1,200 |
| 100 ft. of pipe at US$15ft set of Ball Joints, $3,000. Floating Tanks, drag lines | 322,000 | 10,000 | 3,220 |

---

### 2. Interpreting the Language of the Clauses and Schedules

The Court first looks at the language of the P & I Policy's clauses. The clauses clearly state that coverage under the P & I Policy arises out of Marinex's liability "as owner of" the property listed in the schedule. The clauses therefore direct the Court's attention to the language of the attached schedule.

The schedule attached to and referenced in the P & I Policy's clauses lists the Dredge ARLINGTON as "Dredge: Arlington–1981 26′ Steel." The schedule to the P & I Policy lists no pontoons, pipes, or other equipment owned by Marinex. Marinex claims that the pontoons and pipes are nevertheless covered by the P & I Policy on the grounds that the listing of the dredge in the schedule neces-

sarily includes all of the vessel and that the pontoons and pipes are part of the vessel dredge ARLINGTON.

Marinex's interpretation of the P & I Policy is not persuasive for several reasons. First, the schedule to the P & I Policy lists, in addition to the Dredge ARLINGTON and other vessels, the Barge JOHN, a vessel on which a crane is operated. The P & I Policy lists the vessel and its crane as "Barges: 'JOHN' 1981 120′ Steel incl. crane." (emphasis added). The Court finds that this language was clearly intended to provide Marinex with P & I coverage for the barge *and its crane*. This language suggests that where attachments or implements to a vessel were to be covered by the P & I Policy, they were specifically listed in the schedule to the

P & I Policy. · As there is no language accompanying the specific language in the P & I Policy's Schedule indicating that the pontoons or pipes were to be covered along with the Dredge ARLINGTON by the P & I Policy, the Court infers that the pontoons and ·pipes were not covered by the schedule and, therefore, the P & I Policy.

Second, the language of the Hull Policy's clauses and schedule provide support for the inference that the pontoons and pipes were not included under the P & I Policy.· The Hull Policy defines "vessel" as including "her hull, launches, lifeboats, rafts, furniture, bunkers, stores, supplies, tackle, fittings, equipment, apparatus, machinery, boilers, refrigerating machinery, insulation, motor generators and other electrical machinery." This definition expands the coverage of the "vessel" to certain implements which otherwise might not be deemed essential to its operation as a vessel.

Notwithstanding this broad definition of "vessel" in the policy, the schedule to the Hull Policy lists the pontoons and pipes to be used with the Dredge ARLINGTON *separately* from the listing for the dredge itself, with a separate valuation, deductible, and premium for the pontoons and pipes. This suggests that the Hull Policy does not contemplate that the pontoons and pipes are so essential to the operation of the dredge as to be covered as a matter of course under the hull coverage for the dredge. Moreover, that the pontoons and pipes were listed separately for purposes of the Hull Policy indicates that, by not being listed in the P & I Policy's schedule, P & I coverage was not intended for the pipes or pontoons.

Marinex contends that the schedule to the Hull Policy lists the pontoons and pipes, with their valuations, separately from the dredge because coverage under the Hull Policy is dependent on the value of the property which is covered, and the pontoons and pipes were of substantial value. By contrast, contends Marinex, the pontoons and pipes were not listed under the P & I Policy because coverage under the P & I Policy is unrelated to the value of the property to be insured, and instead is based on liability generally in-

curred during operation of the vessel which is insured.

The Court finds some logic in this position. Specifically, the Court can understand why Marinex, when insuring its property against loss or damage to the property, would list each item of property specifically, with a separate valuation for each item, while, when insuring Marinex against liability during its dredging operations, might think it proper to list only the vessel (but not its appurtenances or implements) in which Marinex would be undertaking such dredging operations.

However, even assuming that this distinction is appropriate, the conclusion that the pontoons and pipes should be covered by the P & I Policy does not follow under the facts of this case. Such a conclusion could only result from this Court's finding that the pipes and pontoons were so essential to the operation of the vessel as to become part of the vessel, and the further finding that the pipes and pontoons remained a part of the vessel even when they were separated from the vessel during transport or while being stored on land.

The only court to consider the relationship of pontoons and pipes to their dredge for purposes of P & I policies found that the pontoons and pipes were not part of the vessel. *See Trinidad Corp. v. American Steamship Owners Mut. Prot. & Indemn. Assoc., Inc.,* 229 F.2d 57, 58–59 (2d Cir.1956). The district court in *Trinidad* had ruled that a "while [a] ... pipeline ... was an appurtenance of the dredge in performing her dredging operations, it was in no sense an essential equipment of the dredge as a vessel." 130 F.Supp. 46, 48 (S.D.N.Y.1955). The district court relied in part on the reasoning of the· court in *Bennett Steamship Co., Ltd. v. Hull Mutual Steamship Protecting Society, Ltd.,* (1913) 3 K.B. 372, *aff'd* (1914) 3 K.B. 57, which distinguished fishing nets (found not to be part of a vessel) from an anchor (found to be part of the vessel) by stating that, unlike an anchor, "Nets are [not] ... things which it is necessary for her to have and without which she could not prudently put to sea." 130 F.Supp. at 49 (quoting *Bennett,* 3 K.B. at 61). The Second Circuit affirmed the district court's opinion in *Trinidad,* noting that in-

surance policies were generally to be interpreted in favor of the insured, but that, in any case, the district court's finding that the pipes and pontoons were not part of the vessel was well grounded. 229 F.2d at 58–59.

Although this Court finds the Second Circuit's logic persuasive, this Court need not determine whether the pontoons or pipes would be covered under the P & I Policy while connected to the dredge and engaged in dredging operations. The collision which gave rise to Marinex's liability in this case occurred not during dredging operations but during the tow of a flotilla of vessels and equipment. The dredging operations were over and the contract completed. The pontoons and pipes were merely being transported. The pontoons and pipes which collided with the fishing vessel were not attached to the Dredge ARLINGTON but instead were located at the opposite end of the flotilla from the dredge. Therefore, even if the Court were to find that the pontoons and pipes were to be covered by the P & I Policy for purposes of dredging operations, the Court could not find that they should be covered as part of the dredge while completely separated from the dredge during their transport. Nor could the Court find that certain pontoons or pipes stored on land were not covered while those being transported by sea unconnected to the operation of the dredge at the time were covered. For this Court to find otherwise would be to allow P & I coverage for the pipes and pontoons no matter what their use or location.

In other words, if Marinex bases it claim that the pipes and pontoons are covered for P & I based on their connection and relationship with the dredge, then coverage for the pontoons and pipes necessarily cannot arise where the connection and relationship are not present, such as where the pontoons and pipes are separate from the dredge and not engaged in the operation of the dredge.

 Thus, the Court finds that the language of the P & I Policy's clauses and schedule clearly do not provide coverage for the collision involving one of Marinex's pontoons or pipes and the F/V CAROLINA DREAM while said pontoons or pipes were separated from the dredge in a flotilla during transport.[5]

### III. Conclusion

This Court finds that there is no issue of material fact in dispute and plaintiff is entitled to judgment as a matter of law. Accordingly, plaintiff CU's Motion for Summary Judgment is GRANTED.

The clerk is DIRECTED to send a copy of this Order to counsel for plaintiff and defendant.

IT IS SO ORDERED.

5. In the interest of completeness, the Court addresses a collateral issue which was raised for the first time in oral arguments. Marinex vaguely contends that Mr. Scruggs acted as an agent for CU and that his representations to Marinex that the pontoons and pipes were covered by the P & I policy should bind CU. This Court disagrees. First, this Court would find that Scruggs solicited insurance on behalf of the assured, Marinex, and therefore was the agent of Marinex. *See Pacific Fire Ins. Co. v. Bowers*, 163 Va. 349, 353–54, 175 S.E. 763, 765 (1934); Endorsement No. 1, General Conditions of insurance policies issued by CU to Marinex; Johnson Aff. at ¶¶ 2, 4 (indicating that Marinex contacted Scruggs about procuring insurance and that Groover, not Scruggs, issued the policies). Moreover, the Court finds that whatever representations Scruggs might have made about the coverage of the pontoons and pipes in the P & I Policy were made *after* the collision. In his deposition, Scruggs states that he did not notice that the pontoons were not listed separately on the P & I schedule and that "it wasn't important ... at the time," whether the pontoons or pipes were covered under the description "Dredge: Arlington–1981 26' Steel." Scruggs Dep. at pp. 55–56. In fact, the only express representation made by Mr. Scruggs that the pontoons and pipes were covered by the P & I Policy appears to have occurred after Marinex informed Scruggs of the claims asserted against Marinex. Scruggs Aff. at ¶¶ 12, 13.