52 F.3d 320
 1996 A.M.C. 608
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
COMMERCIAL UNION INSURANCE COMPANY, Plaintiff-Appellee,
v.
CHARLESTON MARINE LEASING COMPANY; Marinex Construction
Company, Defendants-Appellants.
 No. 94-1563.
 United States Court of Appeals, Fourth Circuit.
 Argued: December 7, 1994
Decided: April 17, 1995
 
 ARGUED: Guilford D. Ware, CRENSHAW, WARE & MARTIN, Norfolk, VA, for Appellants. John Early Holloway, HUNTON & WILLIAMS, Norfolk, VA, for Appellee.
 ON BRIEF: Martha M. Poindexter, CRENSHAW, WARE & MARTIN, Norfolk, VA, for Appellants.
 Before ERVIN, Chief Judge, WILKINSON, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 Charleston Marine Leasing Company and Marinex Construction Company (hereinafter collectively referred to as "Marinex") appeal from the district court's grant of plaintiff's motion for summary judgment. In granting the motion by Commercial Union Insurance Company ("Commercial Union"), the district court found that Marinex's pipes and pontoons were not covered under the Protection and Indemnity ("P & I") Policy issued by Commercial Union and that Commercial Union was not obligated to defend or indemnify Marinex in a pending limitation proceeding. Commercial Union Ins. Co. v. Charleston Marine Leasing Co., 843 F.Supp. 124 (E.D. Va.1994). The district court also denied Marinex's Rule 59(e) motion for reconsideration in which Marinex attempted to raise an alternative theory of the case. For the reasons stated below, we affirm the judgment of the district court in its entirety.
 
 I.
 
 2
 On September 29, 1991, Commercial Union issued two policies to Marinex--a P & I Policy and a Hull Policy. The P & I Policy provided protection and indemnity against liabilities arising out of Marinex's ownership of certain property listed on an attached schedule. The attached schedule contained a list of vessels, including the dredge Arlington (the "dredge"), various barges, and workboats. Commercial Union, 843 F.Supp. at 129. The schedule listed each vessel separately and stated the amount for which each vessel was insured, the deductible, and the premium. The Hull Policy provided coverage to protect against damage to Marinex's equipment listed on an attached schedule. Id. at 130. Each item in the Hull schedule also listed the amount insured, the deductible, and the corresponding premium. The Hull schedule contained the same list of vessels as the P & I schedule, including the dredge, various barges, and workboats. Additionally, the Hull schedule included two items not found in the P & I schedule: (1) "cargo consisting of but not limited to pumps parts, cables, fuel oil, anchors" and (2) "100 ft. of pipe at US$15ft set of Ball Joints, $3000. Floating Tanks, drag lines." The Hull schedule, then, specifically and separately listed pipes and pontoons (floating tanks), whereas the P & I schedule did not list pipes and pontoons at all.
 
 
 3
 The P & I and Hull schedules were created from a single "Schedule of Equipment" listing vessels, cargo, pipes and pontoons, the Hull value for each item, and the deductible for each item that was prepared by F. Hammond Johnson, Marinex's president. Johnson provided this schedule to Marinex's insurance broker, Jimmie Scruggs, requesting P & I and Hull coverage. Scruggs, in turn, provided the schedule to the insurance underwriter for Commercial Union, Wanda Groover. According to Groover, Scruggs informed her that the pontoons, pipes, cargo, ball joints, and draglines were to be covered as contractor's equipment stored on land. Groover made a notation to this effect on the schedule. These items, then, were only given a Hull quote. All other items on the schedule were given both a P & I premium quote and a Hull premium quote. On September 17, 1991, Scruggs, on behalf of Marinex, told Groover to exclude coverage for several vessels on the schedule. A final policy was sent to Scruggs on September 29, 1991, with accompanying schedules for P & I coverage and Hull coverage. This policy was renewed on September 29, 1992, using the same schedules as the prior year, with three minor changes: the port risk endorsement was removed, the navigational warranty was modified, and the premiums were increased. The schedules of covered vessels remained the same for both types of coverage.
 
 
 4
 On November 19, 1992, having concluded its dredging operations, Marinex used the tug, Lady Janice, to move a flotilla of its equipment from Fisherman's Island to the Port of Hampton Roads. The flotilla was similar to a railroad train with its many cars. The tug Lady Janice was followed by the dredge. The dredge was followed by several other barges, including one barge with a thirty-ton crane, followed by sixteen 500 foot sections of steel submerged pipe, four sections of pontoon pipe between 500 and 600 feet, other pipes, and concluding with an anchor barge. While being towed, the pipes and pontoons were not connected to the dredge--the dredge was at the front of the flotilla and the pipes and pontoons were at the rear. The barge carrying the thirty-ton crane capsized, causing the flotilla to break up, and setting the work float, dredge pipe, and pontoons adrift. The next day, the Carolina Dream fishing vessel struck an object identified as either a floating pipe or a pontoon owned by Marinex. The Carolina Dream sank as a result of this collision. On November 16, 1993, Commercial Union filed a motion for summary judgment, arguing that it was not obligated to defend Marinex in a pending limitation proceeding between Marinex and various parties affected by the collision, including the tug Lady Janice and the Carolina Dream fishing vessel. Commercial Union defended Marinex in the limitation proceeding under a reservation of rights. The parties in the limitation proceeding eventually settled. In the present litigation, the district court granted Commercial Union's motion for summary judgment, finding that Commercial Union was not obligated to indemnify or defend Marinex for any liabilities arising as a result of the collision. Commercial Union, 843 F.Supp. 124.
 
 II.
 
 5
 We review the grant of summary judgment de novo on appeal. Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir.1993). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing the grant of summary judgment, we are not constrained by the grounds upon which the district court relied, and we can affirm on any legal ground supported by the record. Jackson, 992 F.2d at 1322.
 
 
 6
 We must determine whether pipes and pontoons are implicitly included under the P & I coverage for the dredge, even though they clearly are not listed on the P & I schedule. In its motion for summary judgment, Commercial Union argued that the P & I Policy issued to Marinex did not cover pipes and pontoons, thus relieving Commercial Union from liability arising as a result of the collision involving the pipes or pontoons. Marinex, on the other hand, argued that pipes and pontoons were implicitly included in the P & I coverage for the dredge Arlington, one of the covered vessels. Because a substantial portion of our decision is based on the district court's opinion, we begin by summarizing the district court's disposition of the case.
 
 
 7
 The district court offered several bases for its finding that pipes and pontoons were not covered under the P & I policy. First, the P & I schedule in its description of one of the barges, the John, contained the following notation: "incl. crane." The court found that such language suggested that when attachments or implements to a vessel were to be included, they were specifically noted. Absent a similar notation for the dredge, such as "incl. pipes and pontoons," the court inferred that they were not covered. Commercial Union, 843 F.Supp. at 130-31.
 
 
 8
 Although the court did not have to examine the Hull Policy to interpret the P & I Policy, it nonetheless examined the definition of vessel in the Hull Policy. Id. at 131. The court noted that the definition was broad, including the hull, launches, lifeboats, rafts, furniture, insulation, motor generators, equipment, apparatus, refrigerating and electrical machinery, and other implements. Id . Despite this broad definition, the Hull Policy still listed the pipes and pontoons separately, with a separate valuation, suggesting that they were not considered an integral part of the dredge, so as to be automatically included within the coverage for the dredge. Id. The court inferred that since pipes and pontoons were listed separately on the Hull Policy and were not listed on the P & I Policy, they were not intended to be covered by the P & I Policy. Id.
 
 
 9
 The district court also found that under Trinidad Corp. v. American Steamship Owners Mut. Prot. & Indemn. Assoc. Inc., 229 F.2d 57, 58-59 (2d Cir.1956), cert. denied, 351 U.S. 966 (1956), the pontoons and pipes were not so essential to the operation of the vessel so as to be considered part of the vessel. Commercial Union, 843 F.Supp. at 131. More importantly, the district court found that they could not be considered part of the vessel when separated from the vessel during transport or during storage on land. Id. In Trinidad Corp., the issue was whether the pipes and pontoons constituted a "vessel or craft" for purposes of insurance coverage. Examining the definition of vessel under 1 U.S.C. Sec. 3, the court noted that pontoons and pipes were not a vessel, even when attached to the dredge in operation, since they were immobile during operation. 229 F.2d at 58. The court also observed that the pipes and pontoons did not constitute "property on board," because they were not on the vessel, regardless of whether they were part of the vessel. Id. The court concluded that the pipe and pontoon lines were "fairly described as movable objects or property," and thus covered under the language of the policy at issue. Id.
 
 
 10
 We note that the court's classification of pipe and pontoon lines as "movable objects or property" in Trinidad suggests that the pipes and pontoons are not considered such an integral part of the dredge so as to be included automatically in the P & I coverage for the dredge, particularly when the dredge is not in operation. Because the collision in this case did not occur during dredging operations, the district court correctly did not reach the question of whether the pontoons or pipes would be covered under the P & I Policy while connected to the dredge and engaged in dredging operations. Commercial Union, 843 F.2d at 132.
 
 
 11
 Marinex argues that the district court erred by finding that the dredge was not in operation at the time of the collision. Marinex argues that the premium for the dredge Arlington was higher than other insured vessels, indicating "that the inflated premiums reflect insurance for the working aspects of the dredge, not just its character as a vessel." Even if this is so, we agree with the district court that the dredge was clearly not in operation at the time of the collision. The district court noted that the collision occurred during the tow of the flotilla and not during dredging operations. Id. at 132. The court also noted that the dredging operations were over and the contract completed. Id. Additionally, the court emphasized that the pontoons and pipes were being transported and were not attached to the dredge, but located at the rear of the flotilla. Id. at 132. Thus, Marinex's argument that the dredge was in operation at the time of the collision is without merit.
 
 
 12
 Also without merit is Marinex's assertion that the district court failed to consider the custom and practice of the industry or the intentions of the party. Contrary to Marinex's argument, under federal maritime law, such evidence is only admissible if the contract is ambiguous. U.S., Eastern Gulf, Inc. v. Metzger Towing, Inc., 910 F.2d 775, 779 (11th Cir.1990). In Eastern Gulf, a maritime contract for towage services did not mention standby time or standby expenses in excess of six days. Eastern Gulf argued that industry custom and the intention of the parties would allow the district court to find that the contract did contemplate payment for standby time. Id. at 779. Finding that the contract "unambiguously did not provide for ... 'standby time' in excess of six days," the court refused to consider the extrinsic evidence. Id.
 
 
 13
 Similarly, in Nilsen v. Mutual Marine Office, Inc., 428 F.Supp. 1375 (D. Mass.1977), the court extensively discussed the admissibility of custom and usage testimony to interpret a marine insurance policy. The court stated that when a policy is clear and unambiguous, "the law is clear that custom and practice evidence cannot be used to vary the provisions of the policy." Id. at 1378-79. Nilsen involved a petition for declaratory judgment brought by Mutual Marine to determine its liability under its "excess" policy of insurance. Even though the contract was silent, Mutual argued that the custom and practice of the industry required the insured or its broker to notify the excess carrier where there is a likelihood that a claim or loss will invade the excess. Id. at 1378. The court found there was no ambiguity in the policy and if Mutual wanted notice of claims, it could have included such a provision in the contract. Id. at 1379. The court also noted that the contract included some provisions about notice and that Mutual had included a provision requiring notice for excess coverage in other contracts. Id. at 1380. Likewise, if Marinex wanted P & I coverage for pipes and pontoons, it could have requested such coverage.
 
 
 14
 In this case, custom and practice evidence is not admissible because there is no ambiguity in the P & I Policy. Though the district court initially suggested it would examine the "language of the P & I Policy, in light of the Hull Policy and the entire agreement between these parties, from the standpoint of an individual cognizant of the practices and usage in this industry," the court's analysis focused solely on the language of the P & I Policy and the Hull Policy. The court's ultimate finding, however, was only based on the P & I Policy. The court specifically found that "the language of the P & I Policy's clauses and schedule clearly do not provide coverage for the collision involving one of Marinex's pontoons or pipes and the[fishing vessel] Carolina Dream while said pontoons or pipes were separated from the dredge in a flotilla during transport." Id . at 132. On this basis, the district court correctly granted Commercial Union's motion for summary judgment.
 
 III.
 
 15
 Marinex also appeals the district court's denial of its Rule 59(e) Motion for Clarification and Reconsideration. We review denials of Rule 59(e) motions under an abuse of discretion standard. Boryan v. United States, 884 F.2d 767, 771 (4th Cir.1989). For the reasons stated below, we hold that the district court did not abuse its discretion in denying Marinex's Rule 59(e) motion.
 
 
 16
 Contrary to Marinex's position, Rule 59(e) does not allow a party to file a Motion for Clarification and Reconsideration. Rule 59(e) allows a court to alter or amend its earlier judgment only in the following circumstances: (1) to accommodate a controlling or significant change in the law since the court's ruling; (2) to account for new evidence which has become available since trial; or (3) to prevent grave injustice or to correct a clear error. Hutchinson v. Staton, 994 F.2d 1076, 1081 (4th Cir.1993). In its Rule 59(e) motion, Marinex requested that the district court clarify whether its ruling that Commercial Union was not required to indemnify or defend Marinex in the limitation proceeding was based solely upon Marinex's ownership of the pipes and pontoons. Marinex attempted to distinguish between three possible sources of liability: liability based on ownership of the pipes and pontoons, liability based on negligence of the crew, and liability based on the unseaworthiness of the vessel. Marinex argued that even if Commercial Union was not obligated to defend Marinex based on its ownership of the pipes and pontoons, it was still obligated to defend Marinex for any damages or costs arising from crew negligence or unseaworthiness of the vessel.
 
 
 17
 Marinex, however, did not raise this distinction between sources of liability in its pleadings. In its response to the motion for summary judgment, Marinex stated: "the entire case rests on a single issue, i.e., whether the P & I Policy covered the casualty at issue involving the collision of the F/V (fishing vessel) Carolina Dream with the floating pipes or pontoons, which had been attached to the Dredge Arlington." The district court agreed, indicating that the court's "essential inquiry" concerned the same issue.
 
 
 18
 Because the sources of liability were not raised in any way during the earlier pleadings or arguments on the summary judgment motion, Marinex is not permitted to raise a new argument through a Rule 59(e) motion. A Rule 59(e) motion is not designed to "serv[e] the office of providing a disappointed suitor with a post-judgment opportunity to argue that which could have been argued pre-judgment." Johnson v. City of Richmond, 102 F.R.D. 623 (E.D. Va.1984). Thus, the district court's denial of Marinex's Rule 59(e) motion was not an abuse of its discretion. The judgment of the district court is accordingly
 
 
 19
 AFFIRMED.